ROLAND L. BELSOME, Judge.
| t Defendant-Appellant Lafayette Insurance Company appeals the judgment in favor of Plaintiff-Appellee Neal Auction Company, Inc. For the reasons that follow, we affirm in part and reverse in part.
FACTS AND PROCEDURAL HISTORY
Neal Auction Company, Inc. (“Neal”), an entity that represents various consignors at auction,, sustained damages from Hurricane Katrina[1] to its main office at 4038 Magazine Street in New Orleans.[2] Neal had six auctions scheduled in 2005, including an auction on October 1st and 2nd, which had a submission deadline of August 29, 2005 and was ultimately can-celled due to Katrina. Neal’s building on Magazine Street sustained damages from Katrina to the roof and gutter, and a utility pole was pulled away from the building. After Katrina, Neal relocated to Baton Rouge temporarily, renting space and sustaining various other operating expenses.[3] Neal eventually held its December auction on December 3rd and 4th with items originally secured for the October auction, in addition to other | ¡Items. The auction generated revenue to Neal in the amount of $370,000.00.[4] Neal returned to the Magazine Street location on or about December 12, 2005.
On June 1, 2005, Lafayette Insurance Company (“Lafayette”) issued Neal a commercial insurance policy for business income loss and extra expense coverage for the Magazine Street location. The business income loss policy had limits of $500,000.00 and was in effect at the time of Hurricane Katrina.[5] Lafayette received notice of the loss on September 15, 2005, and the claim was assigned that day to Crawford & Company for independent adjustment. Neal’s claim was initially handled over the telephone by Mac Allen, and then assigned to adjustor Timothy Meegan on September 16, 2005. Damages to the electrical pole adjacent to the Magazine Street office were repaired on October 4, 2005, and the two properties were inspected by Mr. Meegan six days later, on October 10, 2005.
Subsequent to the inspections, Lafayette prepared an initial report on October 20, 2005, and a final report on November 1, 2005. Lafayette issued payment to Neal for the physical property damage claim on *1138 December 13, 2005.[6] The December 13, 2005 payment did not include the electrical pole repairs. Lafayette ultimately denied Neal’s claim for lost business income and extra expenses on June 1, 2006. After this denial, Neal filed suit against Lafayette on August 25, 2006. After deposing Neal on January 25, 2007, Lafayette tendered to Neal $96,507.83 for additional expenses and $1,300.00 for repairs to the electrical pole. The two checks were issued with correspondence from Lafayette dated June 19, 2007.
laAfter a jury trial in December 2007, the jury reached a verdict in favor of Neal. The trial court’s judgment on the jury verdict awarded Neal $253,699.00 in lost business income; $500,000.00 in damages; $5,000.00 in penalties pursuant to La. R.S. 22:1220; $376,849.50 in penalties pursuant to La. R.S. 22:658; and $87,811.10 in interest [7] (on the damage award of $753.699.00), for a total of $1,223,359.60. Additionally, upon Neal’s Motion for Award of Attorneys’ Fees and to Tax Costs, the trial court awarded 35% in attorneys’ fees and $6,435.76 in costs. The trial court also denied Lafayette’s Motion for New Trial or JNOV. This appeal followed.
On appeal, Lafayette submits five assignments of error for review: first, that the trial court was clearly wrong in finding that Neal had any business income loss; second, that the trial court was clearly wrong in finding that Lafayette misrepresented policy conditions; third, that the trial court committed legal error in finding that Neal sustained $500,000.00 in damages; fourth, that the trial court committed legal error in awarding penalties under both La. R.S. 22:658 and La. R.S. 22:1220; and fifth, that the trial court committed legal error in awarding attorneys’ fees.
STANDARD OF REVIEW
A reviewing court may not disturb findings of fact absent manifest error or unless they are clearly wrong, and where there is conflicting testimony, reasonable inferences of fact should not be disturbed upon appellate review. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). Likewise, where there are two permissible views of [4evidence, the factfinder’s choice between them cannot be manifestly erroneous or clearly wrong. Id.
With respect to damage awards, it is well-settled in Louisiana that the factfin-der is vested with great, even vast discretion, such that appellate courts should rarely disturb an award of general damages. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). Because reasonable persons may disagree regarding the measure of general damages in a particular case, “[i]t is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that an appellate court should increase or reduce the award.” Id.; see Reck v. Stevens, 373 So.2d 498 (La.1979). When damages are not susceptible of precise measurement, the factfinder shall be afforded great discretion for the reasonable assessment of these damages. La. C.C. art.1999; Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976). Conversely, issues of law, such as interpretation of a statute, are reviewed under the de novo standard of review. See Holly & Smith *1139 Architects, Inc. v. St Helena Congregate Facility Inc., 2006-0582, p. 9 (La.11/29/06), 943 So.2d 1037, 1045.
DISCUSSION

Business Income Loss

Lafayette argues that Neal’s certified public accountant (“CPA”), Ralph Li-tolff, improperly calculated Neal’s revenue for purposes of determining whether Neal sustained business income loss. Specifically, Lafayette argues that items intended for the October 2005 auction were combined with items in a December 2005 auction, generating revenue to Neal in the amount of $370,000.00; however, |Rthis amount was deliberately excluded by Mr. Litolff from the business income calculation. Lafayette submits that Neal should not be permitted to exclude this revenue to obtain a double recovery or windfall. Accordingly, Lafayette does not dispute that the business income loss coverage exists under the policy; rather, Lafayette argues that Neal did not sustain any business income loss as a result of Hurricane Katrina. Upon a careful review of the record, we find that Neal set forth sufficient evidence to demonstrate that, pursuant to the applicable policy language, Neal sustained business income loss as a result of Hurricane Katrina.

POLICY LANGUAGE

The language of the portion of the policy entitled “BUSINESS INCOME COVERAGE FORM”, or form CP 00 30, reads in part as follows (emphasis added):
A. COVERAGE
Coverage is provided as described below for one or more of the following options
for which a Limit of Insurance is shown in the Declarations:
(i) Business Income including “Rental Value”.
(ii) Business Income other than “Rental Value”.
(iii) “Rental Value”.
We will pay for the actual loss of Business Income you sustain due to the necessary suspension of your “operations” during the “period of restoration”. The suspension must be caused by direct physical loss of or damage to property at the premises described in the Declarations, including personal property in the open (or in a vehicle) within 100 feet, caused by or resulting from any Covered Cause of Loss.
1. Business Income
Business Income means the:
a. Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred; and
I fib. Continuing normal operating expenses incurred, including payroll.[8]
The policy provision regarding “Extended Business Income” reads as follows:
We will pay for the actual loss of Business Income you incur during the period that:
(1) Begins on the date property (except “finished stock”) is actually repaired, rebuilt or replaced and “operations” are resumed; and
(2) Ends on the earlier of:
(a) The date you could restore your “operations” with reasonable speed, to the condition that would have existed *1140 if no direct physical loss or damage occurred; or
(b) 30 consecutive days after the date determined in (1) above.
Loss of Business Income must be caused by direct physical loss or damage at the described premises caused by or resulting from any Covered Cause of Loss.
The “Period of Restoration” is defined in the Lafayette policy as follows (emphasis added):
“Period of Restoration” means the period of time that:
a. Begins with the date of direct physical loss or damage caused by or resulting from any Covered Cause of Loss at the described premises; and
b. Ends on the date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality.[9]
Ralph Litolff, a Certified Public Accountant and expert for Neal, issued a report with calculations regarding business income loss and total estimated loss. |7Mr. Litolff testified that pursuant to the policy’s specifications for the period of restoration, he began his calculations on the date of the direct physical loss to the insured premises, August 29, 2005 (the date Hurricane Katrina struck), and ended his calculations on November 30, 2005, the date on which electricity was restored to the premises, for a total of 91 days of suspended operations. Based upon a review of the first six months of 2005, which included three auction months and three non-auction months, Mr. Litolff concluded that Neal averaged $2,788.00[10] per day in net income. Accordingly, taking into account a period of restoration of 91 days, Mr. Litolff calculated that Neal sustained a total of $253,699.00 of lost business income.
Neal argues that the testimony at trial established that the electrical service to Neal’s business was restored and repaired by the end of November 2005,[11] but that no evidence suggests that the period of restoration was later than November 30, 2005. Accordingly, because the period of restoration ended at the latest on November 30, 2005, and the policy language provided for an additional thirty days of loss of business income after November 30, 2005, Neal submits that Lafayette cannot argue that in *1141 come applicable to the extended business income coverage also reduces its exposure under the business income coverage provision of the policy.
With respect to Mr. Litolff s omission of the December auction from his business income loss calculation despite the fact that his report noted Neal returned |sto the Magazine Street location on December 12, 2005, Mr. Litolff testified that it was his understanding from Neal that power was restored to the premises by the end of November, and thus when the period of restoration ended pursuant to the policy language. Moreover, Mr. Litolff testified that he did not calculate continuing expenses for the month of December as money that Neal was owed by Lafayette. With regard to his determination that Neal experienced a more profitable year in 2005 than in 2004 and yet still suffered a business income loss from Katrina, Mr. Litolff explained as follows:
Q You have any, in your opinion, from the financial record is it clear that Neal Auction Company in 2005 was doing better than it was in 2004 before Hurricane Katrina?
A Yes.
Q How much better?
A Based on the number I have in my mind because it was my period that I used to calculate losses through the same 6 months. '04, to the same 6 months, '05, revenues were up approximately 30 percent and another model you could look at, you could say October in '04, this is a rough number, I’m just looking at this now. In '04 the October and December auction together generated approximately 5.2 million dollars. If it were 30 percent higher you think [sic] it would be a million 5 higher under the trending analysis not to say no one can predict what is going to happen but that would have put you over, well over 6 million dollars that you would have earned on the same pace based on the '04 numbers, and the total of top line reference now is for October, or keep in mind the auction did not occur, and December was 3.7 million.
Q So even if you would have followed [Defense counsel’s] advice and throw[n] in the money from the December auction [to the business income loss calculation] and you compare[d] October through December of '05 to October through December of '04, did Neal Auction Company lose money?
A Yes, approximately it look [sic ] to be about what a typical auction generate^].
Credibility determinations, including the evaluation of expert testimony, are factual findings. See Rosell v. ESCO, 549 So.2d at 844. Where the testimony |flconflicts, the factfinder’s reasonable evaluation of credibility and reasonable inferences of fact may not be disturbed by a reviewing court, even if the reviewing court feels its own inferences and evaluations and are more reasonable than those of the jury. See Rosell, supra; Hargroder v. Unkel, 39,009, p. 4 (La.App. 2 Cir. 10/29/04), 888 So.2d 953, 957. The factfinder in the instant case heard and evaluated the testimony of each expert CPA and found Mr. Litolffs calculations that Neal lost $2,788.00 per day in net income for a period of 91 days to be most accurate and credible. Upon a careful review of the record, we cannot say that the jury’s factual findings that Neal sustained a business income loss of $253,699.00 in net income were manifestly erroneous or clearly wrong. This assignment of error lacks merit.

*1142
Misrepresentation of Policy Conditions

In its second assignment of error, Lafayette argues that the trial court was clearly wrong in finding that Lafayette misrepresented policy conditions. Lafayette submits that the policy terms as stated in the denial letter are correct and that Lafayette never misrepresented the terms of the policy. Lafayette argues it was not provided with essential facts until Neal’s deposition in January 2007, after which payment was issued to Neal.[12]
In this case, Lafayette initially denied Neal’s claims for extra expenses, finding that the loss of power was excluded by the Off-Premise Exclusion in the policy.[13] Lafayette submits that it was unaware at this time that the pole had been | inrepaired prior to Meegan’s inspection, and moreover, that Neal did not provide any information indicating same to Lafayette, even after the June 1, 2006 denial letter. After Neal’s deposition revealed evidence of the light pole repairs, Lafayette submits that same was sent to Lafayette’s CPA, Mr. Balfour, who issued a supplemental report on May 18, 2007, which stated that the expenses for the pole repair and other extra expenses should be paid. Lafayette further submits that it ultimately issued payment for the extra expenses on June 19, 2007.
Conversely, Neal maintains that Lafayette made multiple policy misrepresentations. On March 6, 2006 claim representative Roberta Sniffin made an internal note in Lafayette’s computer records stating that “[Lafayette has] an exposure here” with respect to business income coverage.[14] On June 1, 2006, however, Lafayette denied Neal’s claim for business income loss. Citing, inter alia, the Exclusions provisions of the policy regarding Off-Premises Services[15] and Water,[16] the *1143 denial letter stated that the “windstorm damage to the covered location ludid not render the building unusuable and would not have prevented you from continuing operations at that location.” The denial letter further stated that “[t]he Business Income loss that resulted from off-premises power and flooding would be excluded.” Neal submits that Lafayette was well aware at this time that the Magazine Street location did not flood, and thus it was a misrepresentation for Lafayette to state that the flood exclusion applied. Finally, Neal argues that Lafayette’s acceptance and reliance upon Mr. Balfour’s methodology of using the tax return information as another basis to deny the claim even though the policy did not condition business income coverage upon an insured’s tax returns revealing more or less net income than the previous year, or contain the words “tax return”. Thus, Neal argues it was a misrepresentation of the policy for Lafayette to rely on terms not in the policy as a basis to deny the business income loss claim. After a careful review of the record in its entirety, we cannot say that the jury’s factual finding that Lafayette misrepresented policy conditions is manifestly erroneous or clearly wrong. This assignment of error lacks merit.

Damages

While a claimant may recover penalties under only one of two bad faith insurance statutes, discussed in the following assignment of error infra, La. R.S. 22:1220 (currently § 22:1973) provides that any insurer-who breaches the duties of good faith and fair dealing “shall be liable for any damages sustained as a result of the breach.” La. R.S. 22:1220 (emphasis added). Misrepresenting policy provisions is one of the acts listed in the statute that constitutes a breach of the [^insurer’s duties.[17] Id. Because we find, as the jury did, that that Lafayette misrepresented policy conditions, Lafayette is liable for damages attributable to its breach of good faith and fair dealing to Neal.
At trial, Neal offered the testimony of Michelle Leckert, the chief financial officer for Neal Auction Company, who testified that Neal lost a significant estate auction, the estate of Martha Ann Samuel.[18] Ms. Leckert testified that Lafayette’s delay in payment, and thus the resulting delay in Neal’s recovery, caused Ms. Samuel’s heirs to choose another auction company to handle the estate, even though Ms. Samuel was an established customer of Neal Auction. Ms. Leckert testified that the estate sold for eight million dollars.
Additionally, the Lafayette policy provided for payment of continuing normal operating expenses. The record evidences that Mr. Litolff testified that, pursuant to his calculations, Neal sustained continuing expenses in the amount of $400,496.00, less *1144 a coinsurance penalty[19] of $215,884.00, for a total of $184,612.00.[20] The report did not include, however, the $1,300.00 tendered by Lafayette in 2007 for the electrical pole damages. Therefore, this amount must be | ^subtracted, for a total of $183,312.00 in remaining business interruption loss and additional expenses.
Additionally, the jury could have determined that Michelle Leckert’s testimony regarding the lost estate auction was credible. Pursuant to Mr. Litolffs report, Neal typically earned 31.85% in gross profits of a total auction, or approximately $2.5 million dollars. If Neal had earned net income from the auction, based on Mr. Litolffs calculations of 8.99% of income on gross profits, Neal could have earned approximately $229,000.00 from the Samuel auction.
In this case, the jury awarded Neal $500,000.00 in damages. Based on the foregoing, the record supports an award of the remainder of business interruption loss due, $183,312.00, in addition to the $229,000.00 from the lost estate auction. The record therefore demonstrates that Neal sustained damages in the amount of $412,312.00.[21] Despite the aforementioned factfinder’s vast discretion with respect to damage awards, we find that the damage award under these facts and circumstances is beyond that which a reasonable trier of fact could assess for the particular injury to Neal in this case. See Youn, supra. Accordingly, we find that the record evidences that the $500,000.00 damage award must be reduced to $412,312.00.
Statutory Penalties — Legal Error
In this case, the trial court awarded 50% penalties in the amount of $376,849.50 (applying the amended version of La. R.S. 22:658) and $5,000.00 (pursuant to La. R.S. 22:1220). Lafayette submits that both awards should be reversed, or in the alternative, that the penalties under La. R.S. 22:658 should be | Ureduced to 25% of the actual damages. The amended version of La. R.S. 22:658, effective August 15, 2006, allows for 50% of damages as an available penalty, in addition to costs and attorney’s fees. Accordingly, the amended version of La. R.S. 22:658 is only applicable to claims arising on or after the effective date. Sher v. Lafayette Ins. Co., 07-2441 (La.4/08/08), 988 So.2d 186; Best v. State Farm Fire & Cas. Co., 2007-0573 (La.App. 4 Cir. 10/10/07), 969 So.2d 671.
Lafayette further argues, and Neal concedes in its brief, that Lafayette can be held liable for penalties under only one of the two bad faith insurance statutes. Calogero v. Safeway Ins. Co., 1999-1625 (La.1/19/00), 753 So.2d 170, 174. When an *1145 insurer fails to comply with both § 22:658 and § 22:1220, recovery is permitted under the statute that provides the greater penalty. Id. Therefore, once Neal establishes bad faith claims handling, Neal is permitted to recover under either § 22:658[22] or § 22:1220.

La. R.S. 22:658

We find that the trial court committed legal error in applying the amended version of La. R.S. 22:658. Because the trial court committed legal error, we review the trial court’s determinations regarding the applicability of the bad faith statutes de novo. See Holly & Smith Architects, supra. Therefore, we must conduct an independent review of the record to determine what, if any, damages and penalties are due Neal.
Prior to the amendments to § 22:658, the penalties available were 25 percent of the damages sustained, and there was no provision for attorney’s fees or costs.[23] Both the Louisiana Supreme Court and this Court have affirmatively held that the changes do not apply retroactively. Sher, supra; Best, supra. Moreover, pursuant to the Supreme Court’s decision in Sher, Louisiana law unambiguously prohibits the continuing-breach rationale, or the argument that an insurer is liable for the continued refusal to pay that extends beyond August 15, 2006. Dickerson v. Lexington Ins. Co., 556 F.3d 290, 307 (5th Cir.1/21/09). Thus, “[a] cause of action and, therefore, an insured’s right to recover, comes into existence when and if the insurer fails to pay *1146 thirty days after receiving satisfactory proof of loss.” Lambert v. State Farm Fire and Casualty Co., 568 F.Supp.2d 698, 706-07 (E.D.La.5/20/08). A satisfactory proof of loss is that which is sufficient to fully apprise the insurer of the insured’s claim. Talton v. USAA Cas. Ins. Co., 2006-1513, p. 15 (La.App. 4 Cir. 3/19/08) 981 So.2d 696, 707 (citing McDill v. Utica Mut. Ins. Co., 475 So.2d 1085, 1089 (La. 1985)).
In this case, Lafayette received notice of the loss on September 15, 2005. Lafayette’s adjuster inspected the property on October 10, 2005, and Lafayette 11fiissued payment on December 13, 2005 for physical damage to the premises. Neal’s claim for lost business income and extra expenses was denied on June 1, 2006. Because the record evidences that Neal provided Lafayette with satisfactory proof of loss prior to August 15, 2006, we find that Neal’s cause of action arose before the effective date of the amendments to La. R.S. 22:658. Although Neal filed its petition after the statute was amended, pursuant to Sher, this is insufficient to trigger the amended version of the statute.[24] The trial court thus committed legal error in applying the amended version of La. R.S. 22:658 to the instant case.

La. R.S. 22:1220

La. R.S. 22:1220 provides as follows (emphasis added):
A. An insurer, including but not limited to a foreign line and surplus line insurer, owes to his insured a duty of good faith and fair dealing. The insurer has an affirmative duty to adjust claims fairly and promptly and to make a reasonable effort to settle claims with the insured or the claimant, or both. Any insurer who breaches these duties shall be liable for any damages sustained as a result of the breach.
B. Any one of the following acts, if knowingly committed or performed by an insurer, constitutes a breach of the insurer’s duties imposed in Subsection A:
(1) Misrepresenting pertinent facts or insurance policy provisions relating to any coverages at issue.
(2) Failing to pay a settlement within thirty days after an agreement is reduced to writing.
(3) Denying coverage or attempting to settle a claim on the basis of an application which the insurer knows was altered without notice to, or knowledge or consent of, the insured.
117(4) Misleading a claimant as to the applicable prescriptive period.
(5) Failing to pay the amount of any claim due any person insured by the contract within sixty days after receipt of satisfactory proof of loss from the claimant when such failure is arbitrary, capricious, or without probable cause.
(6) Failing to pay claims pursuant to R.S. 22:1893 when such failure is arbitrary, capricious, or without probable cause.
C. In addition to any general or special damages to which a claimant is entitled for breach of the imposed duty, the claimant may be awarded *1147 penalties assessed against the insurer in an amount not to exceed two times the damages sustained or five thousand dollars, whichever is greater.
Such penalties, if awarded, shall not be used by the insurer in computing either past or prospective loss experience for the purpose of setting rates or making rate filings.
D. The provisions of this Section shall not be applicable to claims made under health and accident insurance policies.
E. Repealed by Acts 1997, No. 949, § 2.
F. The Insurance Guaranty Association Fund, as provided in R.S. 22:1375 et seq., shall not be liable for any special damages awarded under the provisions of this Section.
In this case, the jury was not manifestly erroneous in determining that Lafayette misrepresented policy provisions. The statute provides for a penalty of $5,000.00 or an amount not to exceed two times the damages sustained, “whichever is greater.” In this case, Neal’s total damages amounted to $666,011.00.[25] Because the amended version of La. R.S. 22:658 is inapplicable to the instant case, La. R.S. 22:1220 provides the greater penalty, and Neal may recover pursuant to the mandates of that statute. Calogero, supra. Accordingly, we |isfmd that an award of double the damages under La. R.S. 22:1220, or $1,332,022.00, is appropriate under these particular facts and circumstances.

Attorneys’ Fees

Because we find that the amended version of La. R.S. 22:658 is inapplicable to the facts and circumstances of the case sub judice, Neal is not entitled to recover attorneys’ fees or costs. See, e.g., Sher, supra.

CONCLUSION

The trial court’s February 22, 2008 judgment is hereby reversed. The portion of the January 22, 2008 judgment on the jury verdict awarding $253,699.00 for business income loss is affirmed; the remainder of the judgment is reversed. Accordingly, for the reasons stated herein, Neal is awarded a total of $666,011.00 in damages, with interest on the damage award from the date of judicial demand,[26] and $1,332,022.00 in penalties pursuant to La. R.S. 22:1220, with interest on the penalties assessed from the date of judgment.
AFFIRMED IN PART AND REVERSED IN PART.
MURRAY, J., Concurs in Part and Dissents in Part With Reasons.
GORBATY, J., Concurs in Part and Dissents in Part for the Reasons Assigned by J. MURRAY.

. Hurricane Katrina struck the Louisiana gulf coast on August 29, 2005.

. Neal maintained another office location at 3923 Carondelet Street in New Orleans.

. Neal transferred all the auction items to the Mississippi Museum of Art in Jackson, Mississippi, prior to starting repairs to its building.

. The auction resulted in $3.7 million in sales, which generated $370,000.00 in revenue to Neal. Neal typically receives approximately ten percent from its consigners at auctions.

. The Carondelet Street location had a policy for property damage only, and thus did not maintain a business income loss policy.

. Roberta Sniffin became the claim representative on January 15, 2006.

. The interest award was calculated from the date of judicial demand (August 25, 2006) through the date of the jury verdict (December 5, 2007).

. Neal reported the following as their income from 2002 to 2005:
2002 — $10,219.00
2003 — $17,504.00
2004 $ 1,598.00
2005 — $90,022.00

. The policy further provides that:
Period of restoration does not include any increased period required due to the enforcement of any ordinance or law that:
(1)Regulates the construction, use or repair, or requires the tearing down of any property; or
(2)Requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants”.
The expiration date of this policy will not cut short the "period of restoration”.

. Mr. Litolff testified that he calculated net income for the six month period in the amount of $504,000.00 over a review period of 181 days, or approximately $2,788.00 per day. Notably, Mr. Litolff testified that he also took into account the first six months of 2004 in making his determinations.

.Although Neal had completed electrical pole repairs in October, Entergy had to inspect the premises and repairs prior to restoring electrical service. Michelle Leckert, the director of administration and finance for Neal, testified that because the transformer was actually attached to Neal’s building, a special city inspection was required by Enter-gy before power could be restored to the facility. She further testified that due to the scarcity of city inspectors, the inspection to get power restored was delayed extensively, despite numerous telephone calls and attempts to contact city council members. Only after the city inspector visited the premises could Neal obtain a permit to have power restored to the building.

. Neal concedes in its brief that it accepts Lafayette's contention that it did not learn of the electrical damage until January of 2007; however, Neal submits that Lafayette failed to reimburse Neal for those expenses within either 30 or 60 days of learning of those expenses, as payment was not issued until June 2007.

. The "Off-Premises Services” exclusion provides as follows:
[We will not pay for loss or damage caused directly or indirectly by] [t]he failure of power or other utility service supplied to the described premises, however caused, if the failure occurs away from the described premises.
But if a loss or damage by a Covered Cause of Loss results, we will pay for that resulting loss or damage.

. When asked at trial what she meant by the note in the computer, Ms. Sniffin testified:
A I was looked at [sic] the commercial policy and the commercial policy don’t [sic ] always have business income, it’s an endorsement that you endorse and when I was reviewing all the Katrina claims when I received them on the master review, this was a CP policy that had an endorsement. So what I’m saying here is that there is a business income endorsement attached to this commercial policy, so it needs to be looked at.
Q All right. And so what you’re telling me now is that when you said we have exposure here, you were just saying in another way that we have coverage?
A Yes, because I acknowledged it in the note so that when someone pick [sic ] it up they can see that quickly without going through 400 pages of this which is at the bottom of the file.

. See supra n. 13.

. The "Water" exclusion provides as follows:
(1) Flood, surface water, waves, tides, tidal waves, overflow of any body of water, or their spray, all whether driven by wind or not;
(2) Mudslide or mudflow;
(3) Water that backs up from a sewer or drain; or
(4) Water under the ground surface pressing on, or flowing or seeping through:
*1143 (a) Foundations, walls, floors or paved surfaces;
(b) Basements, whether paved or not; or
(c) Doors, windows or other openings. But if loss or damage by fire, explosion or sprinkler leakage results, we will pay for that resulting loss or damage.

. The statute further provides that "[i]n addition to any general or special damages to which a claimant is entitled for breach of the imposed duty, the claimant may be awarded penalties assessed against the insurer ...” La. R.S. 22:1220.

. Lafayette submits that Ms. Leckert's statements regarding the Samuel estate were made over their objection because it was not asserted prior to trial; that the testimony was hearsay; that no other documents or evidence were offered by Neal in support; that no person from the estate of Samuel testified that Neal lost the estate due to nonpayment of the claim.

. The coinsurance penalty is referenced in the "Additional Conditions" portion of the policy. The coinsurance condition provides that the insurer will not pay the full amount of any loss if the value of the covered property is greater than the limit of insurance for the property.

. In making his calculations, Mr. Litolff concluded that Neal sustained a loss of $253,699.00 in loss of net business income and $400,496.00 in continuing expenses, for a total of $654,195.00. From $654,195.00, Mr. Litolff deducted $215,884.00 for the coinsurance penalty. Accordingly, Mr. Litolff calculated that, including the business income loss of $253,699.00, Neal sustained a total business interruption loss of $438,311.00. Mr. Litolff’s report further stated that his calculations did not consider the extra expenses incurred in the amount of $96,508.00 because such expenses were reimbursed by Lafayette. Additionally, although Mr. Litolff testified that he also calculated interest in his report, this amount must be discounted, as the judgment provides for judicial interest on the damage award.

.As previously stated herein, this amount does not include the $253,699.00 already awarded for Neal's business income loss.

. The Louisiana Legislature amended La. R.S. 22:658 in June 2006. See 2006 La. Acts No. 813 § 1. The changes went into effect on August 15, 2006.

. La. R.S. 22:658, as previously enacted, provided in pertinent part (emphasis added):
Failure to make [the payments described in § 658] within thirty days after receipt of such satisfactory written proofs and demand therefore or failure to make a written offer to settle any property damage claim, including a third-party claim, within thirty days after receipt of satisfactory proofs of loss of that claim, as provided in Paragraphs (A)(1) and (4) [of § 658], respectively, or failure to make such payment within thirty days after written agreement or settlement as provided in Paragraph (A)(2) [of § 658], when such failure is found to be arbitrary, capricious, or without probable cause, shall subject the insurer to a penalty, in addition to the amount of loss, of twenty-five percent damages on the amount found to be due from the insurer to the insured, or one thousand dollars, whichever is greater, payable to the insured, or to any of said employees, or in the event a partial payment or tender has been made, twenty-five percent of the difference between the amount paid or tendered and the amount found to be due.
The statute as amended provides, in pertinent part (emphasis added):
Failure to make [the payments described in § 658] within thirty days after receipt of such satisfactory written proofs and demand therefore or failure to malee a written offer to settle any property damage claim, including a third-party claim, within thirty days after receipt of satisfactory proofs of loss of that claim, as provided in Paragraphs (A)(1) and (4) [of § 658], respectively, or failure to make such payment within thirty days after written agreement or settlement as provided in Paragraph (A)(2) [of § 658], when such failure is found to be arbitrary, capricious, or without probable cause, shall subject the insurer to a penalty, in addition to the amount of loss, of fifty percent damages on the amount found to be due from the insurer to the insured, or one thousand dollars, whichever is greater, payable to the insured, or to any of said employees, or in the event a partial payment or tender has been made, fifty percent of the difference between the amount paid or tendered and the amount found to be due as well as reasonable attorney fees and costs. Such penalties, if awarded, shall not be used by the insurer in computing either past or prospective loss experience for the purpose of setting rates or making rate filings.

. Because the duty is a continuing one, had plaintiff not first made satisfactory proof of loss prior to the amendment of R.S. 22:658, his petition for damages served after the amendment became effective could have served as satisfactory proof, thereby triggering the time period set forth in the statute and could have subjected Lafayette to the penalties contained in the amendment because the claim would have first arisen after the amendment.
Sher, supra, 988 So.2d at 199 (emphasis added).

. Neal’s total damages are comprised of $253,699.00 for business income loss and $412,312.00 for continuing and other expenses, in addition to the lost estate auction.

. The January 22, 2008 judgment on the jury verdict lists August 25, 2006 as the date of judicial demand.