PAUL A. BONIN, Judge.
| Lafayette Insurance Company unconditionally tendered $40,000 to its insured, Ullah, Inc., for its looting loss following Hurricane Katrina. The jury ultimately decided that Ullah’s looting loss was $450,000 and judgment was rendered on the jury’s verdict.[1] On appeal, Lafayette, conceding that there is no legal error which interdicts the jury’s factual finding, argues for a number of reasons that the jury’s assessment of the loss is clearly wrong and unreasonable. After full review of the record, we disagree with Lafayette and conclude that the jury’s finding of the amount of the looting loss is not clearly wrong and is reasonable.
Ullah, for its part, answered the appeal and seeks statutory penalties and attorney’s fees, which the trial judge refused to award. Ullah contends that the jury specially found in response to an interrogatory that the amount of the unconditional Render was not reasonable. But because on this issue we find that the jury interrogatories and the jury’s answers are ambiguous and confusing, we conclude that its finding regarding the reasonableness of the amount of the unconditional tender is interdicted by legal error and, as a consequence, we review the issue of statutory penalties and attorney’s fees in this case de novo. After our de novo review, we conclude that Lafayette did not act arbitrarily or capriciously in not unconditionally tendering any amount in excess of $40,000.
We affirm the judgment and more thoroughly explain the basis for our decision below.
I
In this Part, we describe the value of Ullah’s property at issue, and we also consider Ullah’s flood and looting losses, for which it was insured by separate insurance providers.
*1196 A
At the time of the storm, Ullah was operating a retail store under the name “A.K. Food Store” on Judge Perez Drive in Chalmette. The total value of the store’s inventory was approximately $1,261,550. In addition to gas and regular convenience store items, the A.K. Food Store sold silver jewelry, fishing equipment, and cigarettes and cigars both foreign and domestic. A diagram of the store shows the actual building measured eighty-four feet across and 53 feet in depth and was divided into the following areas: the main store, counter, office, electrical and supplies, bath, mechanical and storage, cooler, and cigarette storage. The store was equipped with a security system, phone system, display cases, shelving, several cash registers, two computers, a fax machine, copier, printer, office supplies, an ATM machine, ice cream machine, two ice machines, several coolers, a freezer, coffee and drink machines, jewelry cases, and a humidor.
| sUllah’s financial statements and tax records for the years 2003, 2004, and 2005 indicate that Ullah maintained and inventory valued between $900,000 and $1.2 million at the store during those years. Also in evidence is a copy of correspondence from Frank L. Silva, Jr., president of Frank Silva & Sons, Inc., one of Ullah’s three wholesale cigarette suppliers, who attested that Ullah purchased five to six thousand cartons of cigarettes per week.[2]
Due to the extra space, Ullah used the Chalmette A.K. Food Store location to warehouse the tobacco products that it sold in stores at other locations. According to Wajid Khan, cigarettes were stored in the cigarette storage area, as well as in the mechanical & storage, electrical & supplies, and office areas of the store. He testified that Ahmedullah Khan had extra, eight-foot tall shelves built in the office area to store the premium cigarettes. Karen Carreras, Ullah’s bookkeeper, corroborated Wajid Khan’s testimony that this store warehoused the tobacco products that Ullah sold at its other locations. According to Ms. Carreras, Ullah’s Chal-mette store averaged approximately $500,000 in sales each month and tobacco products were its biggest seller.
B
The store was flooded and a considerable portion of its inventory was destroyed by the floodwaters, which reached about four feet. Ullah was insured by Fidelity National Property and Casualty Insurance Company through the National Flood Insurance Program with limits of $500,000. Ullah filed its flood claim with Fidelity in late September of 2005. In connection with the flood claim, Ullah submitted to Fidelity a list of A.K. Food Store’s contents and inventory and their |4estimated value as of the date of the storm. Ahme-dullah Khan and his brother Wajid put this list together from memory over the course of several days,' but they did not keep a copy of the list. The total value of the listed items was $1,261,550. Ahmedullah Khan testified at trial that the $1,261,550 total was a good faith estimate of the value of the store’s inventory at the time of the storm. After an independent adjuster inspected the premises in October of 2005 and determined that the store sustained flood losses far exceeding the policy limits, Fidelity paid Ullah the $500,000 policy limits to settle the flood claim.
*1197 Ullah was separately insured by Lafayette for wind damage and for looting losses. Though Lafayette sent a wind damage adjuster to the store, it was determined that the damage did not exceed the deductible. After Ullah received payment of the limits of its flood policy proceeds, it contacted Lafayette to adjust its claim for looting. Lafayette’s policy limit of coverage for looting losses on the contents of the building is $540,000.
Lafayette had assigned the wind damage claim to Property Loss Consulting, Inc. (PLC) for adjustment. Six people worked on the claim, including Jerrell Fleming and Chuck Street. Mr. Fleming, the initial adjuster, inspected the A.K. Food Store for wind damage on October 15, 2005, and informed Lafayette that the store sustained losses both from flood and looting. Mr. Fleming had noted in his initial report that the front windows and a glass door were broken and that the flood water rose to 3.9 feet inside the store. He also submitted to Lafayette an itemized list of the estimated looted contents, which totaled $395,000. Mr. Fleming’s report recommended that Lafayette reserve $400,000 to cover the looting loss. This information was available to Lafayette before Ullah submitted its looting loss claim to Lafayette.
|fiIn January of 2006, Ullah notified Lafayette that it wanted to initiate a claim for the property looted from A.K. Food Store. Lafayette informed Ullah that it first must submit a copy of a police report from the St. Bernard Sheriffs Office documenting the dates of theft, the property taken, and a detailed list of the stolen items, their replacement value, and proof of ownership.
On January 9, 2006, Ahmedullah Khan, in order to comply with Lafayette’s requirement, filed a looting complaint with the St. Bernard Sheriffs Office. The resulting sheriffs report’s narrative states, in pertinent part:
Mr. Khan stated that he left his store secured on August 28, 2005, the day before Hurricane Katrina and when he returned he found that the doors and windows to his store were smashed and a lot of his merchandise was looted. Mr. Khan stated some of his merchandise was damage (sic) by water, but the majority is unaccounted for. Mr. Khan stated he had merchandise stock well above the water line which is gone. Mr. Khan stated that the non perishable items are gone, fishing equipment, knives, Zippo lighters, gift items, jewl-ery (sic), watches and phone cards are unaccounted for.
The report specifically listed as stolen the following items and their value:
Tobacco products $250,000.00
Jewlery (sic)/watches $ 40,000.00
Imported Cigars $ 5,000.00
Phone cards $ 25,000.00
Gift items $ 13,000.00
Zippo lighters $ 4,700.00
Groceries $ 8,000.00
Fishing Equipment $ 5,000.00
Knives $ 5,000.00
Ullah submitted a copy of this police report to Lafayette in February of 2006.
The Khans tried to reconstruct a list of their inventory from memory to submit to Lafayette in connection with the looting claim. The Khans estimated that they lost approximately $375,000 in inventory, mostly tobacco products, as a result | fiof looting. Ahmedullah Khan did admit that the store’s “salon” or cigarette storage area was still securely locked when he returned after the hurricane, and none of the cigarettes kept there were missing.
Several months later, Ullah submitted an itemized list — again, put together from memory by Ahmedullah and Wajid Khan— that included a description and estimated value of the contents of the A.K. Food *1198 Store as of the date of the storm. The estimated value of the listed items totaled $1,208,660.[3] Ullah also provided Lafayette with copies of its 2003 and 2004 federal and state tax returns as well as its income and balance sheet statements for the two year along with invoices from wholesale suppliers documenting the goods purchased for the store that preceding year.
Lafayette’s claim notes, such as e-mail and other correspondence between PLC adjusters and Lafayette’s claims representatives, disclose a note dated June 22, 2006, in which another PLC adjuster, Mr. Street, opined that flooding caused the loss to the inventory below three feet and that looting was responsible for the loss of the items above that level.
Two months later Roberta Sniffen, the Lafayette employee responsible for managing the looting loss claim, then transferred adjustment of the claim from PLC to the local office of Cunningham Lindsey U.S., Inc., a public insurance adjusting firm. Ms. Sniffen acknowledged that Darryl Davis, the new adjuster, agreed with the assessment made by PLC’s adjusters about the causes and extent of the separate flooding and looting losses.
17Lafayette learned that Fidelity paid the limits of its flood policy in the amount of $500,000 to Ullah based upon Fidelity’s adjustment of the flood claim which assessed the flood loss at $1,161,550. Lafayette based its unconditional tender on the difference between that figure and Ullah’s valuation of its total inventory. On September 22, 2006, Lafayette unconditionally tendered $40,000 to Ullah. Ullah cashed the check on October 13, 2006.
C
On June 27, 2007, Ullah filed a petition in the district court alleging that Lafayette had failed to pay the full amount due for damages caused by looting, and that Lafayette had arbitrarily and capriciously failed to properly adjust its claim. Ullah also alleged that Lafayette had acted in bad faith by failing to settle the claim timely in violation of La. R.S. 22:658 and La. R.S. 22:1220.[4]
Following the liability and damages stage of a bifurcated trial, the jury returned a verdict finding that Ullah sustained a loss of $450,000 solely due to looting. Following the trial on penalties, the jury found that Ullah had provided Lafayette with satisfactory proof of its looting loss no later than September 2, 2006, and that Lafayette had tendered a payment for the loss within 30 and 60 days of the proof of loss. But the jury also found that the amount tendered was not reasonable.
Lafayette moved for a judgment notwithstanding the verdict, arguing that Ul-lah failed to offer sufficient evidence of a looting loss exceeding $40,000, | ¡¡separate and apart from the evidence submitted in conjunction with the flood claim. The trial court denied Lafayette’s motion.
*1199 After the penalty phase of the trial, the trial court found that Lafayette had timely tendered the undisputed amount of $40,000, in accordance with La. R.S. 22:658. The trial court further concluded that, considering that in its opinion the amount of looting loss proven at trial was closer to $400,000, the jury award of $450,000 was intended to include a penalty; therefore, the trial court denied Ullah’s request for statutory penalties. Accordingly, the trial court rendered judgment ordering Lafayette to pay Ullah $410,000 (the amount of the jury award less the prior tender by Lafayette of $40,000), with costs and interest from the date of judicial demand. In a separate judgment, the trial court also denied Ullah its attorney’s fees.[5]
II
In this Part we address Lafayette’s appeal. Lafayette argues that Ullah failed to offer sufficient evidence of looting damages to support the jury’s verdict.[6] Lafayette contends that, in connection with the looting claim, Ullah submitted to Lafayette a detailed inventory list nearly identical to the list it submitted to Fidelity to support its flood claim. Lafayette argues that Ul-lah’s award for looting damages amounts to a double recovery — that because Fidelity attributed to an almost total loss of the store’s inventory to flooding and paid the $500,000 policy limit, Ullah is recovering twice by re-characterizing its flood loss as looting loss. Lafayette also argues that Ullah failed to segregate its flood and looting losses. We disagree with |9these contentions because the evidence in the record does not support a finding that the jury award for Ullah’s looting losses is manifestly erroneous.
Judgment in this case was rendered on the merits after a full trial by jury. After applying the appropriate standard of review to the record, there is no reasonable basis for finding manifest error in the jury’s verdict. Lafayette does not allege legal error to render de novo review of the jury’s award by this court, and accordingly we review the jury’s determination for manifest error. See Adams v. Rhodia, 07-2110, p. 10 (La.5/21/08), 983 So.2d 798, 806. The Louisiana Supreme Court fully described the limits of this review in Rosell v. ESCO, 549 So.2d 840, 844-845 (La.1989), stating that a court of appeal may not set aside a jury’s finding of fact in the absence of “manifest error” or unless it is “clearly wrong,” and moreover, where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. The factfin-der's choice between two permissible yet conflicting views of the evidence will rarely ever be “clearly wrong.” As the court in Rosell explained:
Where documents or objective evidence so contradict the witness’s story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness’s story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. But where such factors are not present, and a factfinder’s finding is based on its decision to credit the testimony of one of two or more witnesses, that finding can *1200 virtually never be manifestly erroneous or dearly wrong.
(citations omitted; emphasis added)
|inIn this case, there was ample evidence — including extensive testimony, photographs, and documentation — before the jury of inventory loss due to looting. The jury had a reasonable basis for finding that Ullah simply submitted in good faith two lists of the inventory in the store at the time of Hurricane Katrina. There are no documents or objective evidence to contradict Ahmedullah and Walib Khan’s assertion that these lists were representative of total inventory, and their credibility on this point was squarely put to the jury. Additionally, there is no evidence to support Lafayette’s intimation that Ullah in bad faith declined to segregate what was looted and what was damaged by flood in order to obtain “double recovery” for its losses.
Ullah was asked twice — by Fidelity and by Lafayette — to submit a list of the A.K. Food Store’s inventory at the time of Hurricane Katrina. Ahmedullah Khan and his brother Walib each gave testimony that they were asked to submit a list of total inventory list on their flood claim, and not a list for items of inventory lost to the flood waters. The first list was put together from memory and sent to Fidelity. The Khans did not keep a copy of this list, and when asked to furnish a list of total inventory to Lafayette for the looting claim, they again tried to compile an inventory list from memory, as they had done for Fidelity. They did not claim that this list was indicative of inventory lost to looting. Instead, the Khans listed the inventory they believed had been looted in the police report that Lafayette required before adjusting the looting claim. This list included approximately $375,000 worth of inventory lost to looting. Mr. Fleming, who initially adjusted for | n Lafayette, estimated that Ullah had lost approximately $395,000 of inventory to looting. The jury’s ultimate assessment of Ullah’s looting losses at $450,000 losses is not an unreasonable sum.
Lafayette argues that Ullah, by submitting nearly identical inventory lists to its insurers, was re-characterizing its flood damage as a looting loss in order to double-recover. First, it should be noted that “[n]o question of double recovery can arise unless the insured would receive more than the property was worth.” 12 Couch on Insurance 3d, § 175:6. As Ullah recovered $500,000 for its flood losses and $410,000 from the trial judgment, Ullah’s total recovery does not exceed the value of its inventory totaling approximately $1.2 million. There is, accordingly, no double recovery in this case.
Lafayette also suggests that Ullah, by accepting the $500,000 policy limit, tacitly accepted Fidelity’s assessment of flood-damaged inventory at $1,161,550. This $1.16 million reflects the total value of Ullah’s inventory after subtracting the non-recoverable depreciation amount of $46,695.10. If Ullah’s acceptance of $500,000 from Fidelity was a confirmation that it lost nearly all its inventory due to flooding, there would have been nothing left to litigate on the looting claim.
The more reasonable explanation is that the jury believed that the flood adjustment was an over-estimation. At trial, two of Lafayette’s witnesses were out-of-town adjusters who handled Ullah’s flood claim: Lawrence Williams and Thomas Hubbard. Mr. Hubbard is a retired insurance adjuster hired by Mr. Williams to do the legwork on the flood claim. Mr. Hubbard spent two-and-a-half [ 12hours at the property on October 18, 2005, to take photos and adjust the claim. Mr. Williams spent twenty minutes there nearly two months later. Mr. Williams admitted that he believed the *1201 flood claim to be above the policy limits, so it did not merit much investigation. Fidelity’s over-estimation of the value of the claim does not translate to a double-recovery for Ullah because Ullah did not recover on the estimation. It is not Ullah’s duty to object to Fidelity’s inelegant valuation of the flood loss.
Lafayette directs us to a federal district court case, Lambert v. State Farm Fire and Casualty Co., to assert that Ullah’s failure to segregate its flood from its looting damages is a sufficient basis for reversing the jury’s verdict. The plaintiff in Lambert was attempting to reclassify flood damage, which had already been paid in full, as wind damage. The court noted that Lambert’s acceptance of the flood proceeds (in the full amount of $190, 185.76) was a tacit confirmation that the damages identified and paid were caused by flood. Lambert, 568 F.Supp.2d at 704. Lambert, however, was not a case where the actual damage to the property exceeded the policy limits. Accordingly, Ullah’s acceptance of the $500,000 policy limit on the flood insurance is not a tacit confirmation that the food store suffered a loss of approximately $1.2 million of its inventory due to flood damage; it is simply a confirmation that the food store suffered at least $500,000 worth of flood damage.[7]
| triBecause Ullah recovered $500,000 for its flood loss and will recover $450,000 for looting, it cannot be true that Ullah has “double-recovered” when its total inventory at the time of the storm approximated $1.2 million. Ullah’s recovery for its losses under Lafayette’s commercial business policy is not a windfall but rather an evidence-based determination of loss by the jury after trial on the merits. There was sufficient evidence of looting at the A.K. Food Store to support the jury’s award, and a fair review of the record mandates that we affirm the judgment below.
Ill
In this Part we address Ullah’s appeal. Ullah’s answer to Lafayette’s appeal argues that Ullah is entitled to the statutory penalties and attorney’s fees of La. R.S. 22:658 as well as the statutory penalties of La. R.S. 22:1220. Ullah argues that because the jury did not find that the amount tendered by Lafayette was reasonable, statutory penalties are due. Because we determine that the process preceding the jury’s finding on this material point was so confusing as to be unreliable, we review Ullah’s claim for penalties and attorney’s fees de novo.
At the second stage of the bifurcated trial, the jury was to determine whether the statutory penalties of either La. R.S. 22:658 or La. R.S. 22:1220 would be applied to the damages awarded in the first stage of the trial. The jury answered six interrogatories (see La. C.C.P. art. 1812) on the issue of penalties:
1 i4(l) Did Ullah, Inc., provide satisfactory proof of loss to Lafayette Insurance Company regarding their looting claim?
YES
If your answer is YES, please proceed to No, 2. If your answer is NO, then please sign the Interrogatories and return to the courtroom.
(2) On what date did Lafayette Insurance Company receive satisfactory proof of loss?
Sept. 2, 06
(3) Did Lafayette Insurance Company fail to pay Ullah, Inc., any amounts owed for theft or looting within 30 days of receipt of satisfactory proof of loss?
*1202 NO
(4) If your answer to Question No. 3 is YES, was the failure to pay the amount arbitrary, capricious or without probable cause?
(blank)
(5) Did Lafayette Insurance Company fail to pay Ullah, Inc., any amounts owed for theft or looting within 60 days of receipt of satisfactory proof of loss?
NO
(6) Was the amount tendered by Lafayette Insurance Company reasonable based upon the information available at that time?
NO
The trial judge later rendered judgment, stating in pertinent part:
After reviewing the post-trial memos, relevant case law and statutes, the Court finds that Lafayette Insurance Company timely tendered the undisputed amount of $40,000 in accordance with La. R.S. 22:658. Furthermore, considering the amount proven at trial was closer to $400,000, the Court concludes that the jury award of $450,000 was intended to include a penalty. Accordingly, the Court denies Plaintiffs request for penalties pursuant to La. R.S. 22:658.
The conduct prohibited by La. R.S. 22:658 A(l) is “virtually identical to the conduct prohibited in La. R.S. 22:1220 B(5): the failure to pay a claim after receiving satisfactory proof of loss when that failure to pay is arbitrary, capricious, or without probable cause.” Reed v. State Farm Mut. Auto Ins. Co., 03-0107, p. 12 (La.10/21/03), 857 So.2d 1012, 1020. These statutes are penal in nature and must be strictly construed. Reed, supra, 857 So.2d at 1020. “One who claims entitlement to penalties and attorney fees has the burden of proving the insurer received satisfactory proof of loss as a predicate to a showing that the insurer was arbitrary, capricious, or without probable cause.” Reed, supra, 857 So.2d at 1020. In this case, there is no argument by either party that the jury was clearly wrong in finding that Lafayette received satisfactory proof of loss on September 22, 2006 and we accept that finding of fact by the jury.
“The phrase ‘arbitrary, capricious, or without probable cause’ is synonymous with ‘vexatious,’ and a ‘vexatious refusal to pay’ means ‘unjustified, without reasonable or probable cause or excuse.” Louisiana Bag Co., Inc. v. Audubon Indem. Co., 08-0453, p. 14 (La.12/2/08), 999 So.2d 1104, 1114. Additionally, the plaintiff must show a lack of compliance with the respective time periods. Long v. American Security Ins. Co., 10-0026, p. 4 (La.App. 4 Cir. 11/17/10), 52 So.3d 260 (citing La. R.S. 22:658 and La. R.S. 22:1220). The jury specially found that Lafayette did not fail to pay any amounts within 30 and 60 days of the date of its receipt of satisfactory proof of loss, which are the respective time periods. Here again neither party argues that this finding is clearly wrong and, of course, the evidence is uncontroverted that the tender of $40,000 was made on September 22, 2006, within thirty days of Lafayette’s receipt of the satisfactory proof of loss. According to the jury interrogatories, to which Ullah did not object,[8] this factual finding precluded a consideration by the jury whether Lafayette’s conduct was “arbitrary, capricious, or without probable cause.” Whether an insurer’s conduct is “arbitrary, capricious, or without probable cause” is essentially a question of fact | ififor the factfinder. See Guillory v. Lee, *1203 09-0075, p. 32 (La.6/26/09), 16 So.3d 1104, 1127 (citations omitted). Consequently, there is no explicit finding of fact that Lafayette’s conduct violated the penalty statutes.
But Ullah argues that the jury’s finding that the amount tendered by Lafayette was not “reasonable” is an implicit finding of fact that its conduct violated the penalty statutes. We disagree.
We first observe that the jury finding sought by the interrogatory is unclear. If the sixth special interrogatory was indeed intended (as Ullah argues) to require the jury to determine whether Lafayette had been arbitrary in its tender, then we do not comprehend why the third and fifth special interrogatories specifically precluded such a finding. Moreover, the selection of the term “reasonable” in the sixth interrogatory is confusing. The words “reasonable” and its opposite “unreasonable” have broader application than the terms “arbitrary, capricious, or without probable cause.” An “arbitrary” action is always an “unreasonable” action, but an “unreasonable” action is not necessarily “arbitrary.” For example, “arbitrary and capricious” action for an award of penalties under the workers’ compensation statute (La. R.S. 23:1201) has been interpreted to consist of “willful and unreasoning action, without regard for facts and circumstances presented, or of seemingly unfounded motivation.” Williams v. Rush Masonry, Inc., 98-2271, (La.6/29/99), 737 So.2d 41, 46 (quoting Brown v. Texas-LA Cartage, Inc., 98-1063 (La.12/1/98), 721 So.2d 885, 890.). Additionally by way of further illustration, the concept of “reasonableness” is a factor in a variety of legal standards that would not necessarily rise to a level of arbitrariness if reasonableness were absent. See, e.g., Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1260 (La.1993) (in which |17the reasonableness of a jury’s award of damages is considered only after the appellate court finds that the trial court abused its discretion); and see, e.g., Meany v. Meany, 94-0251 (La.7/5/94), 639 So.2d 239 (applying the “reasonable man” standard in negligence action). The jury in this case may have simply concluded that a reasonable special damage award was the $450,000 assessed earlier and that Lafayette was wrong, but not necessarily arbitrary in its assessment. The point, however, is that we are simply unable to discern what the jury found, meant, or intended by its response to the sixth interrogatory.
Generally, a jury’s factual finding cannot be set aside unless the appellate court finds that it is manifestly erroneous or clearly wrong. Stobart v. State through Dept. of Transp. and Dev., 617 So.2d 880, 882 (La.1993). Where, however, legal error interdicts the fact finding process, the manifest error standard no longer applies and, if the record is complete, an appellate court should make its own de novo review of the record. Lam v. State Farm Mut. Auto. Ins. Co., 05-1139, p. 3 (La.11/29/06), 946 So.2d 133, 135. “Where the trial court submits a verdict sheet which either confuses or misleads the jury, such interrogatories may constitute reversible error, and thus the ‘manifest error’ standard of appellate review is ignored.” Niklaus v. Bellina, 96-2411 (La.App. 4th Cir.5/21/97), 696 So.2d 120, 124 (citation omitted).
Because the error here does not affect all of the jury’s findings, we apply de novo review to only that finding which is interdicted by error and we accept those that are not. See, e.g., Picou v. Ferrara, 483 So.2d 915, 918 (La.1986).
These two jury interrogatories were confusing, and due to this confusion, the jury never determined whether Lafayette’s payment of the initial $40,000 was arbitrary and capricious, a finding that is re *1204 quired by both statutes. The wording of | mthe jury interrogatories could have suggested to the jury that the timely payment of any amount pretermits a finding that Lafayette acted in an arbitrary and capricious manner. Indeed, the jury did not agree that this tender was “reasonable,” but again, the wording and chronology of the interrogatories fails to clarify the consequences of such a finding. We find that this confusion in the jury interrogatories amounts to legal error, and accordingly, we review the basis for awarding penalties de novo.
Ullah suggests that the jury’s finding that the amount tendered by Lafayette was not reasonable is sufficient for an award of penalties. Ullah alleges that Lafayette failed to pay the “undisputed” amount within the statutory time periods, causing the jury to find that Lafayette’s tender was not “reasonable.” Despite the fact that the jury did not find that Lafayette failed to pay within 30 or 60 days and thus did not make any determination as to whether Lafayette acted in an arbitrary and capricious manner, Ullah asserts that the jury’s failure to find that the tender was “reasonable” nonetheless violates the terms of La. R.S. 22:658 and 22:1220. We disagree.
The Louisiana Supreme Court has noted that, “when there are substantial, reasonable, and legitimate questions as to the extent of an insurer’s liability or an insured’s loss, failure to pay within the statutory period is not arbitrary, capricious or without probable cause.” Louisiana Bag, supra, 999 So.2d at 1114. While an insurer need not tender payment for amounts that are reasonably in dispute, “there can be no good reason — or no probable cause — for withholding an undisputed amount.” Louisiana Bag, supra, 999 So.2d at 1114 (citing Hammett v. Fire Ass’n of Philadelphia, 181 La. 694, 160 So. 302, 304-305) (emphasis in original). Where the exact extent of the damages is unclear, an insurer must tender the reasonable amount which is due. Louisiana Bag, supra, 999 So.2d at 1115. Bad faith will not be |T ¡inferred from an insurer’s failure to make a timely tender when there is a reasonable and legitimate question as to the extent and cause of a claim. Guillory, supra, 16 So.3d at 1127.
After reviewing the record, we find no basis for assessing penalties against Lafayette under either La. R.S. 22:658 or La. R.S. 22:1220 for its initial payment of $40,000 for Ullah’s looting losses. Lafayette did not withhold an undisputed amount without reason. Lafayette calculated Ullah’s looting loss as follows: $1,208,660 (Ullah’s estimated value of the inventory on August 28, 2005) less $1,161,550 (Fidelity’s estimation of the total inventory loss due to flooding) less $8,500 (the value of an AMOCO sign that was included on the inventory list but not covered under the policy, because it was not attached to the building), leaving a total of $38,610 in inventory lost to looting. The basis for Fidelity’s adjustment and settlement of Ullah’s flood claim raised a legitimate question about the extent of Lafayette’s liability to Ullah. We cannot penalize Lafayette for acting on its “substantial, reasonable, and legitimate questions” in determining the amount which was undisputed and which must be tendered. Although Lafayette’s initial calculation of the amount it owed Ullah for its looting losses was wrong or incorrect in light of the jury’s ultimate reasonable factual determination, we do not find Lafayette’s actions to be arbitrary, capricious, or without probable cause.
As there is no basis for finding that Lafayette’s tender amounts to an arbitrary and capricious failure to pay, we deny Ul-lah’s request for penalties and attorney’s *1205 fees under La. R.S. 22:658 and penalties under La. R.S. 22:1220.
|2nDECREE
The judgments in favor of Ullah, Inc. and against Lafayette Insurance Company in the full amount of $410,000, with interest thereon from date of judicial demand until paid, and for costs in the amount of $1,628.20 are affirmed. Costs of appeal are taxed to Lafayette Insurance Company. See La. C.C.P. art. 2164.
AFFIRMED
KIRBY, J., Dissents with Reasons.
GORBATY, J., Dissents.

. The $450,000 gross award is subject to a stipulated credit of $40,000 for the unconditional tender.

. Because both Ullah’s and Frank Silva & Sons’ business records were destroyed in the hurricane, Ullah offered the statement into evidence to establish the amount of cigarettes it purchased weekly from wholesale suppliers.

. At trial, Ullah’s bookkeeper, Ms. Carreras, agreed that this number accurately reflected the total value of the A.K. Food Store's inventory on the day of the hurricane.

. These statutes were renumbered in 2008. La. R.S. 22:658 has been amended and redes-ignated under La. R.S. 22:1892 and La. R.S. 22:1220 was redesignated as La. R.S. 22:1973. See Acts 2008 No. 415. Also, the substance of La. R.S. 22:658 was amended effective August 15, 2006, for claims arising on or after that date. See Sher v. Lafayette Ins. Co., 07-2441, p. 14 (La.7/7/08), 988 So.2d 186, 199. The amendment increased the penalty and provided for attorney’s fees. See Neal Auction Co., Inc. v. Lafayette Ins. Co., 08-0574, p. 14 (La.App. 4 Cir. 4/29/09), 13 So.3d 1135, 1144.

. Judgment rendered on September 21, 2009, which was also appealed by Ullah. See discussion in Part III, post.

. As Lafayette has not argued that the quantum of the jury’s award was excessive, we do not address that issue here.

. We note that in this case there is no issue of concurrent damage or loss.

. See La. C.C.P. art. 1793 C.