STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

19-657

MARTIN BAACK AND BRENDA BAACK

VERSUS

MICHAEL MCINTOSH, ET AL.

**********

APPEAL FROM THE
TENTH JUDICIAL DISTRICT COURT
PARISH OF NATCHITOCHES, NO. 87,843 A
HONORABLE DESIREE DUHON DYESS, DISTRICT JUDGE

**********

VAN H. KYZAR
JUDGE

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Van H. Kyzar, and
Jonathan W. Perry, Judges.

REVERSED AND RENDERED;
AND REMANDED.

**Dorwan G. Vizzier**
**Broussard, Halcomb & Vizzier**
**P. O. Box 11875**
**Alexandria, LA 71315**
**(318) 487-4589**
**COUNSEL FOR PLAINTIFFS/APPELLANTS:**
  **Martin Baack, Individually and on Behalf of Estate of Allissah Baack**
  **Brenda Baack, Individually and on Behalf of Estate of Allissah Baack**

**Jack E. Truitt**
**The Truitt Law Firm**
**149 North New Hampshire Street**
**Covington, LA 70433**
**(985) 327-5266**
**COUNSEL FOR DEFENDANT/APPELLEE:**
  **Zurich American Insurance Company**

**KYZAR, Judge.**

The plaintiffs, Martin and Brenda Baack, appeal from a jury verdict finding that an insurance policy issued by the defendant, Zurich American Insurance Company, did not provide uninsured motorist coverage for injuries Mr. Baack suffered in an automobile accident. For the following reasons, we reverse and render judgment in favor of the Baacks and remand for further proceedings.

## DISCUSSION OF THE RECORD

On July 18, 2014, Mr. Baack, an employee of Pilgrim's Pride Corporation (Pilgrim's), was driving his work vehicle west on Louisiana Highway 6 near Natchitoches, Louisiana, when a vehicle, attempting to make a U-turn from the shoulder of the westbound lane, struck his vehicle. Michael McIntosh, the vehicle's driver, was determined to be solely at fault in causing the accident and pled guilty to improper lane usage, a violation of La.R.S. 32:79.

Mr. Baack was a long-time employee of Pilgrim's, and the vehicle he was operating belonged to PPC Transportation Company (PPC Transportation). Both Pilgrim's and PPC Transportation are subsidiaries of JBS USA Holdings, Inc. (JBS).[1] The defendant, Zurich American Insurance Company (Zurich), is both the workers' compensation (WC) insurer and the auto insurer of JBS. As a result of this accident, Zurich paid WC benefits to Mr. Baack.

Pursuant to La.R.S. 23:1101,[2] Mr. Baack and his wife, Brenda, filed suit, individually and on behalf of their minor child, Allissah Baack, against Mr. McIntosh, his insurer, Allstate Property and Casualty Insurance Company (Allstate),

---

[1] JBS USA Holdings, Inc. is a successor to Swift Foods Company.

[2] La.R.S. 23:1101(A) allows an employee, injured in the course and scope of employment, to file suit against the third party who caused his injury, even though he is receiving workers' compensation benefits. A third person is someone against whom the employee's rights are not limited to workers' compensation.

and Zurich, the uninsured motorist (UM) provider for PPC Transportation's vehicle. In JBS's auto policy with Zurich, PPC Transportation Company is listed as Broad Named Insured. The Baacks sought damages under Zurich's UM coverage based on the alleged uninsured or underinsured status of Mr. McIntosh's vehicle. They also sought penalties and attorney fees pursuant to La.R.S. 22:1973 and La.R.S. 22:1892, based on Zurich's failure to timely settle his claim.

Upon Allstate's tender of Mr. McIntosh's $15,000.00 policy limits, the Baacks dismissed their claims against Allstate and Mr. McIntosh, to the extent of his policy limits, but reserved their rights against Zurich. An order of partial dismissal was rendered on May 19, 2016.

Zurich sought judgments on various issues prior to trial. It moved for summary judgment on the issue of UM coverage, on the grounds that JBS had waived UM coverage in its policy. The Baacks opposed the motion. Judgment was rendered denying the motion on April 28, 2017, and writs to both this court and the supreme court were denied. *Baack v. McIntosh*, 17-501 (La.App. 3 Cir. 7/31/17) (unpublished writ), *writ denied*, 17-1489 (La. 11/13/17), 229 So.3d 926.

Zurich also filed three motions seeking partial summary judgment. The first and second motion sought dismissal of the Baacks' penalty and attorney fee claims. These motions were opposed by the Baacks. A December 22, 2017 judgment denied the first motion, but the record does not contain a judgment specifically addressing the second motion.

Zurich's third motion sought dismissal of Mr. Baacks' claims for past medical expenses and lost wages based on an exclusion in its policy excluding coverage for WC claims. It further argued that because its obligations towards Mr. Baack (as WC insurer and UM provider) were solidary in nature, it was entitled to a credit for all WC benefits (past and future) that Mr. Baack received as a result of this accident.

2

The Baacks opposed this motion. On June 25, 2018, judgment was granted in Zurich's favor, finding that because its obligations towards Mr. Baack were solidary in nature, the collateral source rule did not apply. Thus, it held that Zurich, as UM provider, was entitled to a credit for all past WC benefits paid to Mr. Baack, with the amount to be proven at trial, and a credit towards all future WC benefits he would receive as a result of the accident. However, the judgment held that because Zurich failed to plead the policy exclusion as an affirmative defense in its answer, the defense was waived.

Zurich also moved to bifurcate the coverage issue from the liability and damage issues. The Baacks opposed this motion, and judgment denying the motion was rendered on July 27, 2018.

Prior to trial, the Baacks filed a motion in limine seeking to prevent Zurich from mentioning or referencing to the jury any funds that they had obtained from a collateral source independent of Zurich. On August 24, 2018, judgment was rendered, granting the motion, in part, holding that any evidence pertaining to Mr. Baack's WC claim would only be admissible to the trial court outside of the jury's presence.

This matter proceeded to a jury trial, which lasted five days. After the Baacks rested their case, Zurich moved for a directed verdict on the issue of UM coverage, which was denied. The Baacks, in turn, moved for a directed verdict on this issue after Zurich rested, which was also denied. Following deliberations, the jury reached a verdict finding that Zurich's policy did not provide UM coverage for Mr. Baack's claims because JBS had rejected coverage. A judgment in conformance with the jury's verdict was rendered on September 25, 2018, dismissing the Baacks' claims against Zurich, with prejudice, and casting them with all costs. The Baacks then moved for a judgment notwithstanding the verdict or, in the alternative, for new trial

3

on the issues of UM coverage and damages. Judgment denying both motions was rendered on December 21, 2018. Thereafter, the Baacks perfected this appeal.

On appeal, the Baacks assert six assignments of error:

1.  The jury committed both an error of law and manifest error when on the undisputed facts and evidence, it failed to find that underinsured motorist coverage was provided by the Zurich policy by statute.

2.  The trial court committed an error of law when it overruled plaintiffs' Motion for Directed Verdict on the issue of underinsured motorist coverage at the close of defendant's case.

3.  The trial court committed an error of law when it denied plaintiff's Motion for Judgment Notwithstanding the Verdict or In the Alternative Motion for New Trial.

4.  The trial court committed [an] error of law in ruling on defendant, Zurich's[,] Motion for Partial Summary Judgment by ordering that Zurich was entitled to a credit for past and future workers' compensation payments of indemnity and medical expenses. [Record citation omitted.]

5.  The jury and trial court committed legal error and manifest error in failing to find uninsured motorist coverage under Zurich's policy, and thereby failing to address the remaining issues of liability[,] damages, penalties and attorney's fees. This Court should determine these facts *de novo* on the entire record and render judgment on the merits. Rosell v. Esco, [549 So.2d 840, 844 (La.1989)].

6.  The trial court erred as a matter of law and abused its discretion when it cast plaintiff for all costs for these proceedings for reasons that plaintiffs should have prevailed on the merits and the defendant should have been cast with all costs of these proceedings. [Record citation omitted.]

**OPINION**

The appellate standard of review applicable in this matter was set out by this court in *Stelly v. Bergeron*, 19-102, pp. 13-14 (La.App. 3 Cir. 10/30/19), 283 So.3d 536, 545-46 (alteration in original):

The applicable standard of review as to the merits of this case is set forth in *Monlezun v. Lyon Interests, Inc.*, 11-576, pp. 4-5 (La.App. 3 Cir. 11/2/11), 76 So.3d 628, 632-633:

4

Louisiana appellate courts review both law and facts. *S.J. v. Lafayette Parish Sch. Bd.*, 09-2195 (La. 7/6/10), 41 So.3d 1119. Factual findings are reviewed under the "manifestly erroneous or clearly wrong" standard. *Id.* at 1127. In order to reverse a factual determination of the trial court, the appellate court must first find that a reasonable factual basis does not exist for the finding and that the record establishes that the finding is clearly wrong. *Id.* In cases where there are two permissible views of the evidence, the fact finder's choice between them cannot be manifestly erroneous. *Id.* "However, where documents or objective evidence so contradict a witness's story, or the story itself is so internally inconsistent or implausible on its face that a reasonable fact finder would not credit the witness's story, a reviewing court may well find manifest error." *Id.* at 1127.

If the court of appeal finds that the trial court committed a manifest error of fact or a reversible error of law, the appellate court must then conduct a de novo review of the record and render a judgment on the merits. *Siverd v. Permanent Gen. Ins. Co.*, 05-973 (La. 2/22/06), 922 So.2d 497. In making such a finding, the appellate court "must do more than simply review the record for some evidence which supports or controverts the trial court's findings; it must instead review the record in its entirety to determine whether the trial court's finding was clearly wrong or manifestly erroneous." *Id.* at 499. Thus, the appellate court may not reverse if the trial court's findings are reasonable in light of the record as a whole, even if the appellate court is convinced that it would have weighed the evidence differently if sitting as the trier of fact. *Id.*

We further keep in mind the following as set forth by *LeBlanc v. Allstate Insurance Co.*, 00-1128, p. 4 (La.App. 5 Cir. 11/28/00), 772 So.2d 400, 403, *writ denied*, 00-3522 (La. 2/9/01), 785 So.2d 831:

If the fact finder does not reach an issue because of an earlier finding which disposes of the case, the appellate court, in reversing the earlier finding, must make a de novo determination of undecided issues from the facts presented in the record. *Austin v. Fibrebond Corp.*, 25,565 (La.App. 2 Cir. 2/23/94), 638 So.2d 1110; *Craven v. Universal Life Ins. Co.*, 95-1168 (La.App. 3 Cir. 3/6/96), 670 So.2d 1358, *writ denied*, 96-1332 (La. 9/27/96), 679 So.2d 1355. Generally, if the appellate court makes a finding that the trial court was manifestly erroneous or that there is a legal error and the record is, otherwise, complete, the appellate court should render judgment on the record. In such cases,

5

the appellate court is not subject to the manifest error rule, but decides the case de novo. *Rosell v. ESCO*, [549 So.2d 840 (La.1989)]; *McLean v. Hunter*, 495 So.2d 1298 (La.1986).

## UNDERINSURED MOTORIST COVERAGE

In their first assignment of error, the Baacks argue that the jury legally and factually erred by finding that UM coverage was waived under Zurich's policy. They assert that the 2012, 2013, and 2014 UM selection forms executed by JBS's representative, Stephany A. Rockwell, are valid forms that provide UM coverage at the same limits as the $5,000,000.00 bodily injury liability limits provided in the underlying auto policy. The Baacks also argue that Zurich is precluded from arguing that these UM selection forms are invalid based on the law of the case doctrine. We will address these arguments in reverse order.

### *Law of the Case Doctrine*

In denying Zurich's motion for summary judgment on the UM coverage issue, the trial court stated:

In this case, the UM selection forms submitted in connection with the issuance of policy Nos. 10, 11 and 12 were completed in accordance with statutory requirements, and in accordance with the instructions set forth in the form, and therefore must be given legal effect. As filled out, dated and signed, as provided in the form, by law, the policy was changed to provide UM coverage with the same limits as the policy's liability limits. LSA-R.S. 22:1295(1)(a)(ii) provides that, although the original UM selection is valid for the life of the policy, the original selection or rejection may be changed by submitting a new UM selection form on the form prescribed by the Commissioner of Insurance. The UM selection form for policy No. 12 was also amended by endorsement effect [sic] June 1, 2014, to provide public liability coverage under the Motor Carrier Act which increased the amount to [sic] coverage under the policy by $750,000.00 No new UM rejection was submitted. The accident did not occur until July 18, 2014. The court finds that there are genuine issues of material facts. For these reasons and after considering the competent summary judgment evidence submitted, the law and the arguments presented, the defendant, Zurich's [sic] Motion for Summary [Judgment] is denied at the defendant's costs.

Zurich filed an application for supervisory writs to this court, which was denied. In denying the writ application, this court simply stated, "We find no error in the trial court's judgment." *Baack*, 17-501, p. 1. The Baacks argue that based on the language of the trial court judgment and our writ denial, the law of the case doctrine requires us to find that the 2012, 2013, and 2014 UM selection forms are valid. We disagree that the law of the case doctrine is applicable here.

In this instance, Zurich was the only party who sought a "declaration of coverage by way of motion for summary judgment." *Rodgers v. State Farm Mut. Auto. Ins.*, 15-868, p. 3 (La. 6/30/15), 168 So.3d 375, 376. Rather than filing a cross motion for summary judgment on the issue of UM coverage, the Baacks only opposed the motion. In *Smith v. Brooks*, 96-1085, p. 5 (La.App. 3 Cir. 2/5/97), 689 So.2d 544, 547, this court noted that the Louisiana Code of Civil Procedure "does not authorize the trial court to render a judgment on the merits in favor of a nonmoving party upon denial of the moving party's motion for summary judgment." Thus, despite the language contained in the trial court judgment, the only effect the April 28, 2017 judgment had was to find that genuine issues of material fact existed such that Zurich was not entitled to judgment, as a matter of law, finding a valid waiver of UM coverage. Accordingly, we find no merit in the Baacks argument on this issue.

### *Validity of the UM Selection Forms*

By statute, all Louisiana insurance policies that provide liability coverage "arising out of the ownership, maintenance, or use of any motor vehicle," shall include UM coverage in amounts "not less than the limits of bodily injury liability provided by the policy," unless the insured "rejects coverage, selects lower limits, or selects economic only coverage" on a UM selection form prescribed by the Louisiana Commissioner of Insurance. La.R.S. 22:1295(1)(a)(i), (ii). "A properly

7

completed and signed form creates a rebuttable presumption that the insured knowingly rejected coverage, selected a lower limit, or selected economic-only coverage." La.R.S. 22:1295(1)(a)(ii).

Furthermore, a properly completed UM selection form remains valid for the life of the policy, including policy renewals, reinstatements, substitutions, or amendments. La.R.S. 22:1295(1)(a)(ii). However, an insured may change its original coverage selection at any time by submitting a new UM selection form to the insurer on the form prescribed by the commissioner of insurance. *Id.* With regard to an existing policy, a new UM selection form is only required when the insured changes the policy's limits of liability. *Id.*

> Uninsured motorist coverage embodies a strong public policy, which is to provide full recovery for innocent automobile accident victims who suffer damages caused by a tortfeasor who has no coverage or is not adequately covered by liability insurance. *Cutsinger* [*v. Redfern*], [08-2607 (La. 5/22/09),] 12 So.3d [] 949 (citing *Duncan v. U.S.A.A. Ins. Co.*, 06-363 (La.11/29/06), 950 So.2d 544, 547). The underlying purpose of uninsured motorist coverage "is to promote and effectuate complete reparation, no more or no less." *Id.* (citing *Hoefly v. Government Employees Ins. Co.*, 418 So.2d 575, 579 (La.1982)).

*Bernard v. Ellis*, 11-2377, p. 10 (La. 7/2/12), 111 So.3d 995, 1002-03.

Courts resolve coverage issues by application of the rules utilized in contract interpretation and the provisions of La.R.S. 22:1295. *Id.* "Thus, under the UM statute, the requirement of UM coverage is an implied amendment to any automobile liability policy, even when not expressly addressed, as UM coverage will be read into the policy unless validly rejected." *Duncan v. U.S.A.A. Ins. Co.*, 06-363, p. 3 (La. 11/29/06), 950 So.2d 544, 547. Based on Louisiana's strong public policy regarding UM coverage, the provisions of La.R.S. 22:1295 are liberally construed, while "statutory exceptions to coverage" are strictly construed and must be "clear and unmistakable." *Id.*

8

Proof of an insured's rejection of UM coverage, selection of lower limits, or selection of economic-only limits is satisfied solely by the existence of a properly completed and signed UM selection form, and the insured's intent is irrelevant in this determination. *Id.* As the supreme court stated, "'The expression of a desire not to have UM coverage, however clear, does not necessarily constitute a valid rejection if the expression of rejection does not meet the formal requirements of law[.]'" *Id.* at 553 (quoting *Cohn v. State Farm Mut. Auto Ins. Co.*, 03-2820, p. 5 (La.App. 1 Cir. 2/11/05), 895 So.2d 600, 602, *writ denied*, 05-1000 (La. 6/17/05), 904 So.2d 705). "Whether the policy unambiguously excludes coverage for the damages claimed is solely a question of law to be decided from the four corners of the policy[.]" *Burmaster v. Plaquemines Parish Gov't*, 10-1543, p. 13 (La.App. 4 Cir. 3/30/11), 64 So.3d 312, 321.

In *Duncan*, 950 So.2d at 552, the supreme court laid out six tasks that the insured must perform on the UM selection form in order to effectuate a valid rejection of UM coverage:

> The insured initials the selection or rejection chosen to indicate that the decision was made by the insured. If lower limits are selected, then the lower limits are entered on the form to denote the exact limits. The insured or the legal representative signs the form evidencing the intent to waive UM coverage and includes his or her printed name to identify the signature. Moreover, the insured dates the form to determine the effective date of the UM waiver. Likewise, the form includes the policy number to demonstrate which policy it refers to. Thus, the policy number is relevant to the determination of whether the insured waived UM coverage for the particular policy at issue.

These tasks corresponded to the six tasks required by the insurance commissioner for the proper completion of the UM selection form issued by Bulletin LIRC 98-01.

On August 29, 2008, the insurance commissioner, in Bulletin No. 08-02, issued a revised UM selection form and explained the reasons behind the revision:

> The revision is in response to the myriad of issues that Louisiana courts have recently examined regarding the current UM form, including, but

9

not limited to, what constitutes a properly completed form, what information must be included prior to the insured's signature, policy identification, company identification and backdating. The revised UM form incorporates changes designed to address these issues and assist both insureds and insurers as well as Louisiana courts.

Bulletin No. 08-02 requires the insured to initial the coverage option selected and, if lower limits are selected, enter those limits before signing the UM selection form. Additionally, it is no longer necessary to include the policy, binder, or application number on the form. However, the insurance company's name, group name, or logo must be placed in the form's lower right-hand corner.

Bulletin No. 08-02 noted three important changes in the revised UM selection form, the first of which is pertinent to this matter:

> **Option to "select" UMBI coverage** – The revised UM form removes the option to "select" UMBI coverage with the same bodily injury liability limits set forth in the policy. An insured is not required to "select" UMBI coverage at the same limit as the bodily injury liability coverage set forth in the policy under LSA-R.S. 22:680,[3] because such coverage is statutorily presumed absent a properly completed and signed UM form indicating a different choice.

Accordingly, the UM selection form, as revised, no longer includes an option to select UM coverage equal to the policy's bodily injury liability limits because this coverage occurs by operation of law unless the insured indicates otherwise.

In *Barras v. Cardinal Services, LLC*, 19-530, p. 15 (La.App. 3 Cir. 4/1/20), ＿ So.3d ＿, ＿, we recently held that the number of tasks *Duncan* required for a valid rejection or selection of UM coverage is reduced from six to five by Bulletin No. 08-02:

> 1) initialing the selection or rejection of UMBI coverage; 2) if lower limits are selected, filling in the amount of coverage selected; 3) signing the name of the insured or legal representative; 4) printing the name of the insured or the legal representative; and 5) filling in the date the form was completed.

---

[3] La.R.S. 22:680 was renumbered to La.R.S. 22:1295 by 2008 La. Acts No. 415, § 1.

Zurich, as the insurer, bore the burden of proving that JBS waived UM coverage. *Duncan*, 950 So.2d 544. During the jury trial, Zurich introduced the following copies of its insurance policy into evidence: 1) No. 9305603-00 (Swift Foods), effective September 19, 2002—September 19, 2003; 2) No. 9305603-09 (JBS), effective June 1, 2011—June 1, 2012; and 3) No. 9305603-12 (JBS), effective June 1, 2014—June 1, 2015. Zurich also introduced the November 15, 2002 (Swift Foods) and June 30, 2011 (JBS) UM selection forms and the affidavit of William Trupiewicz, the representative of Swift Foods and JBS that executed the forms. Both Mr. Trupiewicz's affidavit and the UM selection forms indicate that UM coverage was rejected.

Zurich further introduced the deposition of Albert Edward Margis, an insurance underwriter for Zurich North America, who has handled JBS and its predecessors' accounts for the last fourteen years. He testified that Swift Foods first obtained auto insurance from Zurich in 2002, and that it rejected UM coverage via the November 15, 2002 UM selection form executed by Mr. Trupiewicz. The 2002 UM selection form contains the following statement:

> The choice I made by my initials on this form will apply to all persons insured under my policy. My choice shall apply to the motor vehicles described in the policy and to any replacement vehicles, to all renewals of my policy, and to all reinstatement or substitute policies until I make a written request for a change in my Bodily Injury Liability Coverage or UMBI Coverage.

Mr. Margis testified that after JBS increased its liability limits in 2011, Mr. Trupiewicz executed a new UM selection form on June 30, 2011, which also rejected UM coverage. He described the June 30, 2011 form as "a standard form that would go out annually." Mr. Margis agreed that the 2011 UM selection form, which rejected coverage, was still in effect at the time of Mr. Baack's July 18, 2014

11

accident. He further stated that JBS's auto policy, No. 9305603-12, which was effective June 1, 2014, indicated that it did not provide UM coverage in Louisiana.

In opposition to Zurich's claim, the Baacks introduced copies of JBS's 2012, 2013, and 2014 UM selection forms. These forms, just like the 2011 UM selection form, were based on the revised UM selection form and contained four coverage options: 1) UM coverage at lower limits, with blanks for the insertion of the amount of coverage requested; 2) economic-only UM coverage at the same limits as bodily injury coverage; 3) economic-only UM coverage at limits lower than the bodily injury coverage, with blanks for the insertion of the amount of coverage requested; and 4) rejection of UM coverage. The forms also contained the following statement:

> By law, your policy will include UMBI Coverage at the same limits as your Bodily Injury Liability Coverage unless you request otherwise. If you wish to reject UMBI Coverage, select lower limits of UMBI Coverage, or select Economic-Only UMBI Coverage, you must complete this form and return it to your insurance agent or insurance company.

The UM selection forms, dated May 7, 2012, July 1, 2013, and June 1, 2014, were executed by Ms. Rockwell, and contained both her signed and printed name. The blank located next to the second and third UM coverage options contained a pre-printed "N/A," indicating that these coverage options were unavailable. However, Ms. Rockwell failed to select either of the two remaining coverage options, rejection of UM coverage or selection of UM coverage at lower limits, because she failed to initial the blank located next to either of these options. Thus, the Baacks argue that based on this form, JBS selected UM coverage at the same limits as its bodily injury liability limits.

The Baacks further argued that because JBS changed its policy limits in 2014, by adding an endorsement under the Motor Carrier Act, it was required to submit a

12

new UM selection coverage form. Thus, the 2011 UM selection form was no longer valid even if the 2014 UM selection form was found invalid.

In response, Zurich argues, as it did before the trial court, that the 2012, 2013, and 2014 UM selection forms were rendered invalid pursuant to *Duncan*, because Ms. Rockwell failed to select one of the two available coverage options listed on the forms. Thus, based on our opinion in *Rashall v. Pennington*, 08-1 (La.App. 3 Cir. 4/30/08), 982 So.2d 301, *writ denied*, 08-1543 (La. 10/10/08), 993 So.2d 1286, it argues that the 2011 UM selection form, which properly rejected UM coverage, was still in effect when Mr. Baack's accident occurred.

In *Rashall*, we held that a valid UM selection form remained in effect until substituted with a new, valid selection form. Because the insured's subsequent UM selection form was undated, we held that it was invalid; thus, it failed to revoke the prior valid UM selection form, which rejected coverage. After quoting the provisions of La.R.S. 22:680(1)(a)(i), (ii), we stated:

> Thus, there is no question that "an initial valid rejection of UM coverage is also valid for renewal, reinstatement, or substitute policies." *Stephenson v. Van Vleit*, 96-1407, p. 12 (La.App. 3 Cir. 4/30/97), 693 So.2d 858, 865, *writ denied*, 97-1431 (La.9/19/97), 701 So.2d 174. Absent evidence that IESI submitted a new UM selection form to American Casualty as required by La.R.S. 22:680(1)(a)(ii), the original rejection of UM coverage was still valid at the time of Ms. Rashall's accident. In reaching this conclusion, we disagree with Ms. Rashall's argument that when IESI submitted an invalid rejection of UM coverage for the 2004-2005 policy, it effectively revoked the prior rejection. The clear language of La.R.S. 22:680(1)(a)(ii) requires an affirmative act on the part of IESI, i.e., the submission of a new UM selection form to American Casualty "on the form prescribed by the commissioner of insurance." The evidence establishes only that IESI did not properly execute the form reaffirming the original decision to reject UM coverage.

*Id.* at 305.

While we agree with our holding in *Rashall*, we reach a different result under the facts before us. As noted in *Rashall*, the revocation of a prior UM selection form

13

occurs when the insured submits a new, valid UM selection form "to the insurer on the form prescribed by the commissioner of insurance." La.R.S. 22:1295(1)(a)(ii). Thus, whether the 2011 UM selection form was revoked by the 2012, 2013, or 2014 UM selection forms depends on each form's validity, which in turn hinges on whether the tasks required by Bulletin No. 08-02 were satisfied.

As noted, the supreme court, in *Duncan*, recognized the authority of the insurance commissioner, as ceded by the legislature, "to determine what the form would require." *Duncan*, 950 So.2d at 552. Although the supreme court has not revisited the *Duncan* tasks in light of Bulletin No. 08-02, it reaffirmed the insurance commissioner's authority to specify the tasks required for completing a UM selection form in *Chicas v. Doe*, 15-147, p. 1 (La. 5/1/15), 166 So.3d 238, 238 (per curiam), where it stated:

> The regulations of the Commissioner of Insurance, as contained in LDOI Bulletin 08-02, provide for a box on the UM selection form which the insurer may use for policy information purposes, such as policy number, binder number, application number, etc. The regulations further provide, "[t]his box does not need to be filled in for the form to be properly completed." In light of this provision, the absence of a blank box for the policy number does not create a question of fact concerning the form's validity. Accordingly, the judgment of the district court is reversed, and summary judgment is granted in favor of relator.

As we noted in *Barras*, the revised UM selection form now requires the insured to 1) initial the selection or rejection of UM coverage; 2) fill in the amount of coverage if lower limits are selected; 3) sign the name of the insured or legal representative; 4) print the name of the insured or legal representative; and 5) date the form. Although *Barras* did not address this specific issue, we find that an insured is not required to select UM coverage at the same limits as its bodily injury coverage, as "such coverage is statutorily presumed absent a properly completed and signed UM form indicating a different choice." Bulletin No. 08-02. This is not a new

14

concept as the supreme court, in *Duncan*, 950 So.2d at 547, noted that "UM coverage is an implied amendment" to any auto policy and "will be read into the policy unless validly rejected." Thus, if otherwise properly completed and signed, a UM selection form is still valid even though it does not indicate a coverage selection. To hold otherwise would repudiate the commissioner of insurance's authority, as recognized by *Duncan*.

Just as the insurer bears the burden of proving that the insured rejected UM coverage, it also bears the burden of ensuring that the UM selection form is properly completed. *Id.* In *Gray v. American National Property & Casualty Co.*, 07-1670, pp. 15-16 (La. 2/26/08), 977 So.2d 839, 849-50, the supreme court discussed this burden:

> This court has also previously rejected arguments similar to Coregis's argument that Ms. Johnson's actions were a valid reformation of the policy. In both *Samuels v. State Farm Mut. Auto. Ins. Co.*, 06-0034, p. 9 (La.10/17/06), 939 So.2d 1235, 1241, and *Duncan* [*v. U.S.A.A. Insurance Co.*], 06-0363 at 15 [(La. 11/29/06)], 950 So.2d [544,] 553, this court distinguished failures to comply with the UM selection form requirements established by the Insurance Commissioner from other types of clerical errors in insurance contracts that might be subject to reform. The failure to comply with the requirements for confecting a valid UM selection form are not subject to reformation.
>
> Any perceived unfairness to the insurer resulting from this decision is, we believe, offset by the fact that the insurer had both the authority and the opportunity to assure that the UM selection form in this case was completed properly. In fact, we note that the language of Ms. Johnson's cover letter to the school board when she sent the UM selection form for Dr. Rudd's signature seemed to invite Dr. Rudd to do exactly what he did. That letter instructed Dr. Rudd that if he wanted to change the selection of UM coverage limits from the $100,000 previously chosen by the school board, he should "mark the form accordingly." However, the letter then stated that "if no change in limits are requested, please sign, date and return the form with the proper selection marked within 10 days." With the exception of providing the date of his signature, Dr. Rudd did exactly as he was instructed. Nowhere in the letter was Dr. Rudd instructed to fill in the space for the amount of lower UM limits, or any of the other blank spaces. Further, once the incomplete form was received from the school board, nothing prevented the agent from returning the form to

15

Dr. Rudd with instructions for properly completing the form. The insurer, not the insured, has the responsibility of assuring that the form is completed properly, and Coregis did not fulfill that responsibility in this case.

Clearly, based on a plain reading of Bulletin No. 08-02 and the revised UM selection form, Zurich should have known that Ms. Rockwell's failure to select one of the two remaining UM coverage options would result in JBS selecting UM coverage at the same limits as its $5,000,000.00 bodily injury liability limits. The bulletin, with the revised UM selection form, was issued on August 29, 2008. Furthermore, an insured is not required to submit a new UM selection form in order to renew an auto policy. Both La.R.S. 22:1295(1)(a)(ii) and the jurisprudence are clear on this point. *See Rashall*, 982 So.2d 301. However, Zurich clearly required JBS to submit a new UM selection form every year when it renewed its policy.

The record establishes that JBS renewed Policy Number 9305603 twelve times between September 19, 2002 and June 1, 2014. The record also contains the 2002, 2011, 2012, 2013, and 2014 UM selection forms associated with the policy. Mr. Margis described the 2011 UM selection form as "it's kind of -- this is a standard form that would go out annually." Thus, if Zurich requires its insured to execute a new UM selection form at each policy renewal, contrary to La.R.S. 22:1295(1)(a)(ii), it bears the consequences of the form being completed, as it was in this matter, in accordance with Bulletin 08-02.

Furthermore, if Zurich knew that JBS intended to reject UM coverage in 2012, 2013, and 2014, as indicated by Mr. Margis, nothing prevented it from sending the selection forms back to Ms. Rockwell with instructions that she select the option rejecting UM coverage. *Gray*, 977 So.2d 839. In *Morrison v. USAA Casualty Insurance Co.*, 12-2334, p. 2 (La. 1/11/12), 106 So.3d 95, 95-96, the supreme court discussed just this scenario:

16

In the instant case, it is undisputed the insured's representative attempted to complete the required tasks to reject UM coverage, but mistakenly failed to initial the line rejecting UM coverage at the time he returned the form to the insurer. Consistent with our suggestion in *Gray* [*v. American National Property & Casualty Co.*, 07-1670 (La. 2/26/08), 977 So.2d 839], the insurer returned the incomplete form to the insured's representative. The insured's representative then initialed the line rejecting UM coverage and returned the form to the insurer, thereby confirming an acceptance of, and agreement with, all of the information contained on the form. Although the exact date of the initialing is unclear, the evidence presented by relator establishes it occurred prior to the subject accident. Therefore, the rejection of UM coverage is valid.

Zurich failed to comply with this suggestion. Instead, Zurich required its insured to submit new UM selection forms at each policy renewal, which were on forms prescribed by the commissioner of insurance. Thus, these UM selection forms are valid and, as signed documents, they have legal consequences. *Draayer v. Allen*, 15-1150 (La.App. 1 Cir. 4/15/16), 195 So.3d 78; *see also* Judge Pettigrew's dissent in *Hughes v. Zurich Am. Ins. Co.*, 13-2167 (La.App. 1 Cir. 8/20/14), 153 So.3d 477, *writ denied*, 14-2220 (La. 1/915), 157 So.3d 1107. As we noted in *Alexander v. Estate of McNeal*, 10-66, p. 5 (La.App. 3 Cir. 6/30/10), 44 So.3d 338, 341, *writ denied*, 10-1807 (La. 10/29/10), 48 So.3d 1093:

> The insurer cannot pick and choose which one of the rejection forms to enforce and required Mr. Dupar to sign for both. There are legal consequences flowing from signed documents; and certainly Republic, as the drafter and presenter of the July 31, 2007 waiver form, should be held to those consequences.

Moreover, the only way to find these forms invalid is to rely on JBS's intent, which *Duncan* specifically held was irrelevant in UM coverage determinations. Finally, we note the well-settled rule "that a party who signs a written instrument is presumed to know its contents and cannot avoid its obligations by contending that he did not read it, that he did not understand it, or that the other party failed to explain it to him." *Aguillard v. Auction Mgmt. Corp.*, 04-2804, 04-2857, p. 22 (La. 6/29/05), 908 So.2d 1, 17. Here, JBS is bound by the UM selection form, as completed by its

17

representative, and Zurich, as insurer, cannot avoid its obligations as established by the signed UM selection form.

Accordingly, we find that the 2014 UM selection form, which was effective June 1, 2014, is valid and provides UM coverage equal to the $5,000,000.00 bodily injury liability coverage contained in JBS's auto policy. Zurich stipulated that Mr. Baack was an insured under the auto policy if it was determined that the policy provided UM coverage. Consequently, we find that the jury legally erred in finding that Zurich's policy did not provide UM coverage to Mr. Baack for his claims arising from the July 18, 2014 accident. Therefore, the judgment of the trial court is reversed on this issue. Based on this finding, we need not address the Baacks second and third assignments of error. Because the record before us is complete, we will conduct a *de novo* review of the Baacks' remaining liability and damage claims and render judgment on the record.

## *DE NOVO* REVIEW—LIABILITY

After reviewing the record, we find that it is uncontested that Mr. McIntosh was solely at fault in causing this accident. The parties stipulated that he pled guilty to improper lane usage, a violation of La.R.S. 32:79, and that this violation caused the accident. Furthermore, Mr. McIntosh testified that he never saw Mr. Baack's vehicle before he attempted the U-turn. Accordingly, we find Mr. McIntosh one hundred percent at fault in causing the July 18, 2014 accident.

We further find that Mr. Baack's injuries were caused by this accident. Commencing the morning after the accident, he consistently complained of pain in his left lumbar spine, hip, and thigh and down into his left leg. He was diagnosed with bilateral lumbar radiculopathy, an annular tear at L5-S1, and lateral recess stenosis at L4-5. Mr. Baack underwent a two-level 360-degree fusion at L4-5 and L5-S1, with the insertion of cages and screws and bone grafts; a laminectomy at L4;

18

a subtotal laminectomy at L5; and a left posterolateral fusion with bone graft from L4 to the sacrum. Although his condition improved after surgery, he was still experiencing pain in his left buttock and leg at the time of trial.

Dr. Eubulus Kerr, III, Mr. Baack's treating orthopedic surgeon, opined that more likely than not the July 18, 2014 accident was the cause of his injuries. Although the medical records indicated that Mr. Baack complained of back pain on at least four occasions prior to the accident, Dr. Kerr noted that Mr. Baack's pain complaints differed after the accident in that he complained of left hip and leg pain, which diagnostic testing determined emanated from his L4-5 and L5-S1 disk levels. While Dr. Kerr agreed that Mr. Baack's preexisting condition was aggravated by the accident, he strongly disagreed that Mr. Baack had significant preexisting degenerative arthritis in his lower back. He said that he only observed normal age-related findings in Mr. Baack's lower back after reviewing his August 19, 2014 MRI.

It is settled law that "a defendant takes his victim as he finds him and is responsible for all natural and probable consequences of his tortious conduct." *Lasha v. Olin Corp.*, 625 So.2d 1002, 1005 (La.1993). Mr. Baack was physically able to work as a truck driver prior to the accident, but commencing with the accident, he could no longer do so. Accordingly, we find that Mr. Baack has proven that more probably than not the July 18, 2014 accident was the cause of his injuries. *Maranto v. Goodyear Tire & Rubber Co*, 94-2603, 94-2615 (La. 2/20/95), 650 So.2d 757.

## *DE NOVO* REVIEW—QUANTUM

The Baacks sought the following damages: past and future medical expenses; past lost wages, future lost wages and future loss of earning capacity; past and future disability; past and future mental pain and suffering; past and future physical suffering; past and future loss of enjoyment of life; and past and future loss of consortium.

19

### General Damages

General damages "are speculative in nature and incapable of being fixed with mathematical certainty." *Ivory v. Safeway Ins. Co. of La.*, 19-521, p. 10 (La.App. 3 Cir. 12/18/19), 287 So.3d 807, 815. They "include pain and suffering, physical impairment and disability, and loss of enjoyment of life[.]" *Id.*

> Pain and suffering, both physical and mental, refers to the pain, discomfort, inconvenience, anguish, and emotional trauma that accompanies an injury. Loss of enjoyment of life, in comparison, refers to detrimental alterations of the person's life or lifestyle or the person's inability to participate in the activities or pleasures of life that were formerly enjoyed prior to the injury. In contrast to pain and suffering, whether or not a plaintiff experiences a detrimental lifestyle change depends on both the nature and severity of the injury and the lifestyle of the plaintiff prior to the injury.

*McGee v. A C & S, Inc.*, 05-1036, p. 5 (La. 7/10/06), 933 So.2d 770, 775.

"The primary objective of general damages is to restore the party in as near a fashion as possible to the state he was in at the time immediately preceding injury." *McDowell v. Diggs*, 17-755, 17-595, p. 20 (La.App. 1 Cir. 10/3/18), 264 So.3d 489, 502. The assessment of general damages must include consideration of "the severity and duration of the injured party's pain and suffering." *LeBlanc v. Stevenson*, 00-157, p. 6 (La. 10/17/00), 770 So.2d 766, 772.

Mr. Baack endured approximately thirty-nine months of constant severe pain in his left lower back, hip, thigh, and leg prior to his November 6, 2017 surgery. Although his condition improved following surgery, he still experienced left buttock and leg pain in the ten months prior to trial. During his testimony, he described his pain, on a scale of one to ten, as being a five on good days and a six on bad days. He takes pain medication three and sometimes four times a day and sees a pain management physician once a month.

Dr. Kerr testified that he thought the residual pain Mr. Baack experienced following his surgery was caused by left-sided sacroiliac joint dysfunction, which

20

more probably than not would require physical therapy, injections, or possibly surgery to fuse the joint. Furthermore, Dr. Kerr and Dr. Gerald LeGlue, a specialist in physical medicine and rehabilitation, both agreed that the fusion of L4-5 and L5-S1 would cause significant degeneration at L3-4. Dr. LeGlue explained that the fusion would place increased stress on L3-4, causing that level to deteriorate more quickly and eventually develop lumbar spinal stenosis. Although Dr. LeGlue, who examined him once, thought it predictable that Mr. Baack would require surgery in twelve to fifteen years due to the anticipated stenosis, Dr. Kerr stated that the necessity of the future surgery was still to be determined. Dr. Kerr and Dr. LeGlue both agreed that Mr. Baack was permanently restricted to light-duty work as a result of his physical impairment.

Mr. Baack has definitely suffered a detrimental alteration to his lifestyle because of this accident. He can no longer drive trucks for a living and was terminated from his position with Pilgrim's because of his disability. Sexual intercourse hurts his back, and back pain disturbs his sleep. Back pain prevents Mr. Baack from socializing, hunting, fishing, riding his ATV, mowing his yard, tilling his garden, taking out the trash, performing vehicle maintenance, and playing with his six-year-old daughter. It has further curtailed his attendance at his Masonic Lodge and visits to his fish camp. Mr. Baack is unable to drive long distances without stopping to stretch his legs; sit or stand for very long; or walk more than two hundred yards. He also suffers from diabetes, and prior to his accident, he was able to lose weight and stop taking diabetes medication. Since the accident, he has regained the weight he had lost, and consequently, is taking diabetes medication again.

21

Considering the severity and duration of his pain and suffering, his disability, and the detrimental alteration to his lifestyle as a result the accident, we award Mr. Baack $425,000.00 in general damages.

### *Special Damages*

#### *Affirmative Defense*

At the outset, we note the Baacks' argument that Zurich failed to plead, as an affirmative defense in its answer, the extinguishment of its obligation through Mr. Baack's receipt of WC benefits. However, under the facts of this case, we find that Zurich was not required to affirmatively plead this defense because it did not raise a new issue. *Hooper v. La. Pigment Co., LP*, 19-816 (La.App. 3 Cir. 5/13/20), _ So.3d _.

Louisiana Code of Civil Procedure Article 1005 requires a defendant to specifically plead all affirmative defenses in its answer, and the failure to plead a defense results in a waiver of the defense. *Davis v. Nola Home Constr., L.L.C.*, 16-1274 (La.App. 4 Cir. 6/14/17), 222 So.3d 833.

> However, an issue does not automatically become an affirmative defense, as that term is defined by Louisiana caselaw, simply because it appears among the items listed in La. C.C.P. art. 1005, or because courts have recognized it as an affirmative defense in other cases. Whether an issue is an affirmative defense is a question of fact, determined by the circumstances of the individual case. Louisiana jurisprudence defines an affirmative defense as a defense that "raises a **new matter**, which assuming the allegations in the petition are true, constitutes a defense to the action." *Allvend, Inc. v. Payphone Commissions Co., Inc.*, 2000-0661, p. 3 (La.App. 4 Cir. 5/23/01), 804 So.2d 27, 29 (emphasis added). Implicit in that definition is the conclusion that a defendant is not required to raise an issue as an affirmative defense if it does not raise a "new matter." Moreover, the purpose of the rule established by La. C.C.P. art. 1005, requiring that defendants specially plead affirmative defenses, is "to give fair notice of the nature of the defense and thereby prevent a last minute surprise to the plaintiff." *Id.*

*Bienvenu v. Allstate Ins. Co.*, 01-2248, pp. 5-6 (La.App. 4 Cir. 5/8/02), 819 So.2d 1077, 1080.

Based on the fact that Zurich was both the WC insurer and UM provider in this matter, we find that the Baacks had fair notice of the credit issue and were not surprised when Zurich raised the issue in its partial summary judgment motion. It is undisputed that Mr. Baack was employed by Pilgrim's. The trial court noted this in its April 28, 2017 judgment denying Zurich's summary judgment motion on the UM coverage issue. Additionally, the Baacks admitted in the August 13, 2018 joint pre-trial order, that Mr. Baack was injured while in the course and scope of his employment, and the Baacks and Zurich both listed the credit issue as a legal issue to be decided at trial. Finally, Mr. Baack admitted that beginning in August 2015, he began receiving $619.00 per week in workers' compensation benefits as a result of this accident. He admitted that he "still [receives] 619 [sic] from somebody. I don't know who it's from."

In *Boudreaux v. State, Department of Transportation and Development*, 00-50 (La.App. 1 Cir. 2/16/01), 780 So.2d 1163, *writ granted*, 01-1329 (La. 6/29/01), 794 So.2d 804, *writ dismissed*, 01-1329 (La. 2/26/02), 815 So.2d 02 (per curiam), the first circuit held that a defense raised in a joint pre-trial order properly placed the defense at issue in the trial. Accordingly, we find that the Baacks had fair notice of the credit issue, and the requirements of La.Code Civ.P. art. 1005 were satisfied.

### *Collateral Source Rule*

The Baacks, in their fourth assignment of error, argue that the trial court erred in granting partial summary judgment in Zurich's favor, finding it was entitled to a credit for all past and future WC benefits Mr. Baack would receive as a result of the accident. While we agree that Zurich was not entitled to partial summary judgment based on the evidence introduced in support of its motion, on the merits, we find that it is entitled to a credit for the past medical expenses and lost wages Mr. Baack received in WC benefits.

23

In *Bellard v. American Central Insurance Company*, 07-1335, 07-1399 (La. 4/18/08), 980 So.2d 654, the supreme court held that an employer's UM carrier and WC insurer were solidarily liable to an employee injured at the hands of an underinsured tortfeasor, to the extent of the employee's claim for medical expenses and lost wages. Thus, the employee's receipt of medical expenses and lost wages through WC benefits exonerated the UM carrier's liability for those same damages. The supreme court further held that the collateral source rule would not apply to deny the credit because under the facts of the case, the rule's application did not advance the public policy goals of tort deterrence and accident prevention and because application would result in the employee receiving double recovery of his damages for medical expenses and lost wages. In summation, the supreme court stated, "The collateral source rule has no application in cases where the plaintiff is injured in the course and scope of his employment at the hands of a third party tortfeasor and the employer is without fault." *Id.* at 670. In *Simmons v. Cornerstone Investments, LLC*, 18-735, p. 6 (La. 5/8/19), 282 So.3d 199, 203, the supreme court further held that "it is clear that the collateral source rule is tethered to payments actually *received* by the plaintiff."

The facts in this case differ from those in *Bellard* only to the extent that the UM provider and WC insurer are one and the same rather than different insurers as in *Bellard*. Thus, we find an even greater reason for finding that the collateral source rule does not apply in this instance. To hold otherwise would not only allow Mr. Baack double recovery of his damages for past medical expenses and lost wages, it would require Zurich to pay these damages twice. Accordingly, we find that Zurich is entitled to a credit in the amount that Mr. Baack has actually for received medical expenses and lost wages as WC benefits.

24

### Past and Future Medical Expenses

In *Menard v. Lafayette Insurance Co.*, 09-1869, pp. 12-13 (La. 3/16/10), 31 So.3d 996, 1006 (alterations in original), the supreme court set forth the jurisprudence pertaining to awards for past and future medical expenses:

> Under Louisiana law, a tort victim may recover past (from injury to trial) and future (posttrial) medical expenses caused by tortious conduct. Frank L. Maraist & Thomas C. Galligan, Jr., *Louisiana Tort Law* § 7.02[1], 7-5(Michie 2009). The victim must, however, establish he incurred past medical expenses in good faith as a result of his injury and future medical expenses will more probably than not be incurred. *Stiles v. K Mart Corp.*, 597 So.2d 1012, 1012 (La.1992)(remanding for a determination of "an award for future medical expenses which the medical evidence established that plaintiff, more probably than not, will be required to incur"); Maraist & Galligan, *supra*, § 7.02[1], 7-5-7-6. A plaintiff shows the probability of future medical expenses with supporting medical testimony and estimations of their probable cost. *Smith v. Municipality of Ferriday*, 05-755, pp. 11-12 (La.App. 3 Cir. 2/1/06), 922 So.2d 1222, 1231, *writ denied*, 06-0934 (La.9/29/06), 937 So.2d 860; *Highlands Ins. Co. v. Missouri Pacific R. Co.*, 532 So.2d 317, 324 (La.App. 3d Cir.1988), *judgment affirmed sub nom. Lee v. Missouri Pacific R. Co.*, 540 So.2d 287 (La.1989); *see also, Stiles*, 597 So.2d at 1012 (referring to future medical expenses established by medical evidence). Importantly, future medical expenses must be established with some degree of certainty. *Highlands*, 532 So.2d at 324. Nevertheless,

> > [w]hen the record establishes that future medical expenses will be necessary and inevitable, the court should not reject an award of future medical expenses on the basis that the record does not provide the exact value of the necessary expenses, if the court can examine the record and determine from evidence of past medical expenses and other evidence a minimum amount that reasonable minds could not disagree will be required.

> *Stiles*, 597 So.2d at 1012. The proper standard for determining whether a plaintiff is entitled to future medical expenses is proof by a preponderance of the evidence the future medical expense will be medically necessary. *Hoskin v. Plaquemines Parish Gov't*, 97-0061 (La.App. 4 Cir. 12/1/97), 703 So.2d 207, 211, *writ denied*, 98-270, 98-271 (4/3/98), 717 So.2d 1129.

> Notably, it is well acknowledged an award for future medical expenses is in great measure highly speculative and not susceptible to calculation with mathematical certainty. *Highlands*, 532 So.2d at 324. It follows, therefore, such awards "generally do not involve determining the amounts, but turn on questions of credibility and

25

inferences, i.e., whose experts and other witnesses does the jury believe?" Maraist & Galligan, *supra*, § 7.02, 7-4.

A summary introduced by the Baacks totaled Mr. Baack's past medical expenses at $259,210.17. However, the parties stipulated that the amount actually paid through WC was $79.038.11. All WC medical expenses are paid based on a reimbursement schedule, and any expense in excess of the reimbursement schedule amount is not "recoverable against the employee, employer, or workers' compensation insurer." La.R.S. 23:1034.2(A), (D). Moreover, medical expenses paid in excess of the reimbursement schedule do not qualify as collateral source funds recoverable by the employee. *Simmons*, 282 So.3d 199. In *Simmons*, the supreme court stated:

> [T]here is no basis to differentiate between the "written off" amount created by a reduced reimbursement fee under the Workers' Compensation Act and those of a Medicaid program or an attorney-negotiated medical discount. (*See Bozeman* [*v. State*, 03-1016 (La. 7/2/04), 879 So.2d 692,] and *Hoffman* [*v. 21st. Century N. Am. Ins. Co.*, 14-2279 (La. 10/12/15), 209 So.3d 702]). The bottom line is that the plaintiffs in each of these situations did not actually incur, and need not repay, the "written off" amounts at issue. Such amounts are illusory in that they are never statutorily susceptible of being paid by the plaintiffs. In the instant case, Plaintiff did not contribute to his employer's workers' compensation insurance premiums nor did he otherwise pay any consideration for the benefits. The healthcare providers, by law, cannot charge him for more than what the fee schedule allows. La. R.S. 23:1034.2(D). This reduction is not the benefit of some bargain struck by Plaintiff; rather, in much the same way that medical expenses covered by Medicaid are limited by statute, so too are the medical expenses limited purely by operation of the Workers' Compensation Act. Thus, Plaintiff's patrimony was not diminished. Therefore, any recovery in addition to the reduced amount of medical bills would be a windfall to Plaintiff and against the rationale behind the collateral source rule. The discounted rate accurately reflects Plaintiff's compensatory damages, and anything beyond that rate would amount to punitive damages. Plaintiff's ability to fully recover and to be made whole is adequately represented by the availability of the reduced medical bills.

*Id.* at 205.

Accordingly, we find that Mr. Baack has incurred $79,038.11 in past medical expenses. However, after applying Zurich's credit for this amount, the award is reduced to zero.

With regard to future medical expenses, we find that Mr. Baack has proven, by a preponderance of the evidence, that he will require annual follow-up visits, including radiographs, with Dr. Kerr for two years and a CT scan at the end of the two-year period. He will also require sixteen weeks of physical therapy over the next two years and, at the least, two sacroiliac joint injections. We further find that Mr. Baack will require future treatment by Dr. Kerr, physical therapy, and, at least, two steroid injections ten years out as a result of the anticipated degeneration at L3-4. Although Drs. LeGlue and Kerr both discussed the possibility of future back surgery, Dr. Kerr, Mr. Baack's treating physician, could not say that more probably than not the surgery would be necessary. We further find that the Baacks failed to prove that more probably than not Mr. Baack would require future pain management treatment. Although Dr. Kerr was happy for this treatment to continue, he twice stated that he left the decision for future treatment to the pain management physician. Because no evidence presenting this physician's opinion was introduced into the record, we find that the Baacks failed to prove the future medical necessity of this treatment.

Accordingly, based on our review of the medical billing records introduced into evidence, we find that Mr. Baack will require $29,497.00 in future medical expenses. Thus, we award him $27,890.83 as the present value thereof.

### *Lost Wages and Future Loss of Earning Capacity*

A plaintiff is entitled to damages for lost wages upon proof that, but for the accident, he would have been earning wages. *Boyette v. United Servs. Auto. Ass'n*, 00-1918 (La. 4/3/01), 783 So.2d 1276. The award is based upon the plaintiff's past

27

earnings and the length of time he was unable to work because of the accident. *Id.* Although the accident occurred on July 18, 2014, Mr. Baack continued working approximately one year following the accident. He was terminated by Pilgrim's and then began receiving WC indemnity benefits on August 11, 2015. Accordingly, based on Mr. Baack's earnings of $52,618.28 per year and the 3.1 years he was unable to work, we find that he incurred $163,116.67 in past lost wages. The parties stipulated that Mr. Baack received $100,278.00 in WC wage benefits as of September 4, 2018. Thus, based on Zurich's credit in this amount, we award Mr. Baack $62,838.67 in damages for past lost wages.

Determining an award for future loss of earning capacity is not as simple a calculation as an award for past lost wages. In *Meyers v. Broussard*, 96-1634, pp. 18-19 (La.App. 3 Cir. 5/21/97), 696 So.2d 88, 98, this court reviewed the burden of proof and the factors to be considered for awarding these damages:

> Before [the plaintiff] can recover for her loss of future earning capacity, she must prove the loss, not with mathematical certainty, but with reasonable certainty. *Gauthier v. Kansas City S. R. Co.*, 96-529 (La.App. 3 Cir. 11/6/96); 682 So.2d 993, *writ denied*, 96-2918 (La.1/24/97); 686 So.2d 867. Future loss of earnings is inherently speculative and must be proven with a reasonable degree of certainty; purely conjectural or uncertain future lost earnings will not be allowed. *Perritt v. Commercial Union Ins. Co.*, 95-1274 (La.App. 3 Cir. 3/13/96); 673 So.2d 215, *writ denied*, 96-1751 (La.10/11/96); 680 So.2d 644. An award for loss of future earning capacity is not based merely upon the difference between the injured person's pre-accident wages and post-accident wages but rather it should be based on the difference between the injured person's earning capacity before and after the accident. *Hollie v. Beauregard Parish Police Jury*, 96-198 (La.App. 3 Cir. 8/28/96); 680 So.2d 1218.
>
> In determining the proper amount to be awarded, the trier of fact should consider the injured person's age, life expectancy, work life expectancy, investment income factor, productivity increase, prospects for rehabilitation, probable future earning capacity, loss of future earning capacity, loss of earning ability, and inflation. *Gauthier*, 96-529; 682 So.2d 993. Our review of this award is governed by the manifest error standard. *Veazey v. State Farm Mut. Auto. Ins.*, 587 So.2d 5 (La.App. 3 Cir.1991). "The appellate question is not whether

28

a different award may have been more appropriate, but whether the trial court's award can be reasonably supported by the record." *Id.* at 7.

Mr. Baack turned fifty-nine the last day of the trial, and he had a life expectancy of 23.3 years and a work-life expectancy of 6.9 years. He quit school in the ninth grade and worked for Country Pride until 1981.[4] He then worked as a roughneck in the oilfield for approximately five years, before returning to ConAgra. During his twenty-eight-year stretch of employment with ConAgra and then Pilgrim's, he caught chickens, worked as a yard hand, welder's helper, utility hand, forklift operator, and truck driver. He was employed as a truck driver at the time of the accident.

A July 2, 2018 functional capacity examination (FCE), performed by Dr. Steve Allison, restricted Mr. Baack to modified light duty work, with the following accommodations and restrictions. Frequent sitting, standing, and walking, with hourly interruptions to stand, walk, or sit. Lifting floor to waist—occasionally fifteen pounds for objects located at least twelve inches above floor level; no lifting for objects located below twelve inches above floor level. Lifting waist to shoulder—twenty pounds occasionally and ten pounds frequently. Lifting above the shoulder—twenty pounds occasionally. Carrying at waist level—twenty pounds occasionally and ten pounds frequently; pushing/pulling twenty-pounds force occasionally and ten pounds-force frequently. Climbing, balancing, and stooping occasionally, but no kneeling, crouching, or crawling. Reaching with left and right arm—forward constantly and overhead frequently.

Dr. Allison determined that Mr. Baack's lower back was at its maximum rehabilitation potential, which left him with a severe and permanent functional impairment. He further opined that "Mr. Baack's prognosis for adjusting to other

---

[4] Country Pride and ConAgra were both earlier iterations of Pilgrim's.

29

work is poor based on his age, education, work experience, and the severity of his functional limitations." Dr. Allison opined that Mr. Baack could no longer safely drive trucks unless his employer accommodated his limitations and restrictions, which included driving no more than four hours a day, with hourly interruptions to stand and walk. Dr. Kerr agreed with these findings. Dr. LeGlue suggested that Mr. Baack should be restricted from lifting more than twenty pounds for the rest of his life.

Testing administered by both parties' vocational rehabilitation experts revealed that Mr. Baack is functionally illiterate. Mr. Baack reads and comprehends at the first grade or just below the first grade level; he performs math at the second grade level; his verbal skills are below average; and his nonverbal skills and his overall IQ composite are in the lower extreme. Ted Deshotels, the Baacks' expert, opined that because Mr. Baack lacks a high school degree and is illiterate, the only employment available to him is entry-level employment. Thus, he felt that Mr. Baack's best chance for employment would be in the fast food industry, but for the fact that these jobs, which require four to eight hours of standing and lifting up to fifty pounds, exceed his physical restrictions. Mr. Deshotels stated that he found no jobs that he felt more probably than not would allow Mr. Baack to maintain secure employment. Although he agreed that cashier, security guard, and production assembly line jobs are usually light duty, he stated that these jobs were beyond Mr. Baack's physical restrictions and educational limitations.

Although Zurich's vocational rehabilitation expert identified four potential jobs, Mr. Deshotels testified that they also exceeded Mr. Baack's restrictions and educational limitations. The four jobs were for a driver/transporter for a car rental company; a food service worker at the university; a delivery driver for a restaurant; and a custodian, to clean offices. Mr. Deshotels stated that the driver/transporter job

30

required a high school degree; the food service worker job exceeded Mr. Baack's standing/walking restrictions; a typical delivery driver job is medium duty, involving loading/unloading, quick stops, time constraints, and the ability to read; and custodial jobs are typically medium duty, requiring the ability to lift up to fifty pounds.

Considering the foregoing, we find that Mr. Baack's permanent physical impairment and physical restrictions, when combined with his functional illiteracy, render him unemployable. Based on his $52,618.28 per year earnings and his 6.9 years of work-life expectancy, we find that Mr. Baack will lose $363,066.13 in future earnings. Thus, we award him $354,026.02 as the present value of this award.

Accordingly, Mr. Baack is awarded $425,000.00 in general damages and $444,755.52 in special damages, for a total damage award of $869,755.52. Applying the settlement credit of $10,449.27[5] to this amount, judgment is rendered awarding Mr. Baack a total of $859,306.25 in damages. Based on our damage awards and the proof introduced establishing the $15,000.00 policy limits of Mr. McIntosh's vehicle, the Baacks established their right to proceed against the UM coverage provided by Zurich's policy.

### *Loss of Consortium*

The Baacks sought damages for loss of consortium on behalf of Mrs. Baack and their six-year-old daughter, Allissah. In addition to the "loss of general overall happiness," loss of consortium encompasses "love and affection, society and companionship, sexual relations, the right of performance of material services, the right of support, aid, and assistance, and felicity." *Bellard v. S. Cent. Bell Tel. Co.*,

---

[5] Although the Baacks' settled with Mr. McIntosh for his $15,000.00 policy limits, the parties stipulated that Zurich, as WC insurer, was reimbursed $4,550.76 from the settlement proceeds. According, we reduce Mr. Baack's damage award by $10,449.24.

31

96-1662, p. 21 (La.App. 3 Cir. 8/27/97), 702 So.2d 695, 707, *writ denied*, 97-2415 (La. 12/12/97), 704 So.2d 1202. A spouse's burden of proof for loss of consortium is three-fold. She must prove the defendant's liability, her spouse's damages, and her resulting loss of consortium. *Detraz v. Hartford Accident & Indem. Co.*, 94-708 (La.App. 3 Cir. 12/7/94), 647 So.2d 576. A minor child bears the same burden of proof absent "the sexual component." *Id.* at 581.

The record reveals that Mrs. Baack and Allissah have both suffered a loss of consortium because of Mr. Baack's injuries. They no longer socialize with their relatives or friends, hold fish fries, or attend crawfish boils. Mr. Baack no longer hunts with Mrs. Baack or fishes with her and Allissah, and their visits to their Toledo Bend fish camp have greatly decreased.

Mrs. Baack stated that she and Mr. Baack have no sex life since the accident because of his back pain. She said that he is no longer able to play ball with Allissah; thus, she stated that Allissah is always questioning why he no longer plays with her. She stated that Mr. Baack can no longer perform maintenance on or wash their vehicles, mow the grass, till the garden, or lift anything. Mrs. Baack testified that since his surgery, Mr. Baack is unable to do anything at home and that he stays more to himself. She said that he is harder to get along with since the accident, and as a result, they quarrel more now than they did previously.

Based on the foregoing, we award damages in the amount of $35,000.00 and $7,500.00 to Mrs. Baack and Allissah, respectively, for loss of consortium.

### *Penalties and Attorney Fees*

The Baacks also sought penalties and attorney fees pursuant to La.R.S. 22:1973 and La.R.S. 22:1892. The Insurance Code requires an insurer to pay a claim within thirty days after receipt of satisfactory proof of loss, and the failure to pay within that time period, if found to be arbitrary, capricious, or without probable cause,

32

subjects the insurer to penalties and reasonable attorney fees. La.R.S. 22:1892(A), (B)(1). Under the fraud and unfair trade practices chapter of the Insurance Code, an insurer has an affirmative duty to adjust claims fairly and promptly, and the failure to pay within sixty days after receiving satisfactory proof of loss, if found to be arbitrary, capricious, or without probable cause, may result in the assessment of penalties against the insurer. La.R.S. 22:1973(A), (B)(5), (C).

In *Guidry v. USAgencies Casualty Insurance Co., Inc.*, 19-602, pp. 8-9 (La.App. 1 Cir. 12/27/19), 294 So.3d 13, 21, *writ denied*, 20-343 (La. 5/1/20), _ So.3d _, the first circuit stated:

> One who claims entitlement to penalties and attorney fees has the burden of proving the insurer received satisfactory proof of loss as a predicate to a showing that the insurer was arbitrary, capricious, or without probable cause. **Reed [v. State Farm Mut. Auto. Ins. Co.]**, [03-107 (La. 10/21/03),] 857 So.2d [1012,] 1020. A "satisfactory proof of loss" is that which is sufficient to fully apprise the insurer of the insured's claim. **Louisiana Bag Co., Inc. v. Audubon Indem. Co.**, 2008-0453 (La. 12/2/08), 999 So.2d 1104, 1119; **McDill v. Utica Mut. Ins. Co.**, 475 So.2d 1085, 1089 (La. 1985). To establish a "satisfactory proof of loss, "the insured must show that the insurer received sufficient facts which fully apprise the insurer that (1) the owner or operator of the other vehicle involved in the accident was uninsured or underinsured, (2) that he was at fault, (3) that such fault gave rise to damages, and (4) establish the extent of those damages. **McDill**, 475 So.2d at 1089. The sanctions of penalties and attorney fees are not assessed unless a plaintiff's proof is clear that the insurer was in fact arbitrary, capricious, or without probable cause in refusing to pay. **Reed**, 857 So.2d at 1021. The phrase "arbitrary, capricious, or without probable cause" is synonymous with "vexatious," and a "vexatious refusal to pay" means "unjustified, without reasonable or probable cause or excuse." **Louisiana Bag**, 999 So.2d at 1114.
>
> An insurer's conduct depends on the facts known to the insurer [at] the time of its action. Penalties should not be assessed when the insurer has a reasonable basis to defend the claim and acts in good-faith reliance on that defense. **Louisiana Bag**, 999 So.2d at 1114. Especially when there is a reasonable and legitimate question as to the extent and causation of a claim, bad faith should not be inferred from an insurer's failure to pay within the statutory time limits when such reasonable doubts exist. **Reed**, 857 So.2d at 1021. In those instances where there are substantial, reasonable, and legitimate questions as to the extent of an insurer's liability or an insured's loss, failure to pay

33

within the statutory time period is not arbitrary, capricious or without probable cause. **Louisiana Bag**, 999 So.2d at 1114.

After a *de novo* review, we find that Zurich's failure to pay Mr. Baack's claim was not arbitrary, capricious, or without probable cause. Although Zurich based its refusal to pay in part on its interpretation of the 2014 UM selection form, it also based it on the grounds that the Baacks failed to establish satisfactory proof of loss. We agree.

Counsel for the Baacks faxed a total of eleven letters to Zurich requesting payment for medical expenses incurred by Mr. Baack as a result of the July 18, 2014 accident. The first letter was sent to Zurich one day before the Baacks' amended their petition to add Zurich, as the UM provider of Mr. Baack's work vehicle, as a defendant and alleged they were entitled to penalties and attorney fees based on Zurich's failure to timely settle Mr. Baack's claim pursuant to La.R.S. 22:1973 and La.R.S. 22:1892.

The Baacks bore the burden of proving that Zurich failed to comply with the time constraints contained in these statutes. *Ullah Inc. v. Lafayette Ins. Co.*, 09-1566 (La.App. 4 Cir. 12/17/10), 54 So.3d 1193, *writs denied*, 11-100, 11-134 (La. 3/25/11), 61 So.3d 665. Based on the medical billing records introduced into evidence, we find that a large number of the medical expenses had already been paid by Zurich, as WC insurer, before the Baacks' sent their requests. In fact, counsel for the Baacks admitted, in an October 13, 2017 faxed letter to Zurich's counsel, "Regarding Mr. Baack's medical expenses, I am not aware of any medical expenses that have not been submitted to Zurich for payment nor am I aware of any medical bills that have not been paid by Zurich." Mr. Baack, when asked if his past medical expenses had been paid by his employer or WC insurer, stated, "I assume they have."

34

He further admitted that he had not paid any of his medical expenses resulting from this accident.

Accordingly, because Mr. Baack admitted that his medical expenses are the responsibility of his employer and its WC insurer (also Zurich), we find that the Baacks failed to prove that Zurich, as UM provider, was arbitrary, capricious, or without probable cause in failing to pay the requested medical expenses within the statutory time limit. Whether these medical expenses were timely paid is a matter that should be taken up under Mr. Baack's WC claim. Thus, their claim for penalties and attorney fees is denied.

### Court Costs

Finally, the Baacks argue that the trial court erred in assessing them with all court costs. Following the jury verdict, the trial court rendered judgment on September 25, 2018, dismissing the Baacks' claims against Zurich and casting them with all costs. On April 23, 2019, the trial court granted Zurich's motion to tax the Baacks with $15,606.05 in court costs. This judgment is the subject of a separate appeal. *Baack v. McIntosh*, 19-657 (La.App. 3 Cir. _/_/20), _ So.3d _. Based on the reversal of the jury verdict and our judgment in their favor, we reverse the trial court judgment assessing the Baacks with all court costs and render judgment assessing Zurich with these costs. Accordingly, we remand the matter to the trial court for a cost determination.

### DISPOSITION

For the foregoing reasons, the judgment of the trial court, based on the jury's verdict finding that the auto policy issued by Zurich American Insurance Company did not provide uninsured motorist coverage, is reversed; and judgment is rendered in favor of Martin and Brenda Baack, individually and on behalf of their minor child Allissah, finding that Zurich American Insurance Company's auto policy provides

35

up to $5,000,000.00 in uninsured motorist coverage for the injuries Mr. Baack suffered as a result of the July 18, 2014 accident. Judgment is rendered in favor of Martin Baack, awarding him $425,000.00 in general damages and $444,755.52 in special damages, for a total damage award of $859,306.25. Judgment is further rendered in favor of Brenda Baack, awarding her $35,000.00 in damages for loss of consortium, and in favor of Allissah Back, awarding her $7,500.00 in damages for loss of consortium. The judgment of the trial court assessing the Baacks with $15,606.05 in court costs is reversed, and judgment is rendered assessing Zurich American Insurance Company with all court costs from the trial court proceeding, with the matter remanded to the trial court for a determination of those costs. All costs of this appeal costs are assessed to Zurich American Insurance Company.

**REVERSED AND RENDERED; AND REMANDED.**